## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| FLUOROTELOMER CONSORTIUM )<br><br>*Petitioner*, )<br><br>v. )<br><br>U.S. ENVIRONMENTAL )<br>PROTECTION AGENCY )<br><br>*Respondent*. ) | Case No. 24-1373 |

## PETITION FOR REVIEW

Pursuant to Section 19 of the Toxic Substances Control Act, 15 U.S.C. § 2618, the Administrative Procedure Act, 5 U.S.C. §§ 701-706, Federal Rule of Appellate Procedure 15, and D.C. Circuit Rule 15, the Fluorotelomer Consortium hereby petitions this Court for review of an order issued by the respondent, the U.S. Environmental Protection Agency (EPA), entitled *Order under Section 4 of the Toxic Substances Control Act (TSCA)*, dated October 8, 2024, issued to take effect on October 13, 2024. The order (Test Order) requires the development and submission of certain information for the chemical substance 6:2 Fluorotelomer acrylate (Chemical Abstracts Service Registry Number® (CAS RN®) 17527-29-6). A copy of the Test Order is attached hereto as Exhibit A. This Petition is timely filed within 60 days of issuance of the Test Order.

Respectfully submitted,

Dated: December 9, 2024

*/s/ Kelly N. Garson*

Kelly N. Garson
Lynn L. Bergeson
BERGESON & CAMPBELL, P.C.
2200 Pennsylvania Ave., N.W., Suite 100W
Washington, DC 20037
Telephone: (202) 557-3801
Facsimile: (202) 557-3836
kgarson@lawbc.com
lbergeson@lawbc.com

*Counsel for Petitioner Fluorotelomer
Consortium*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

| | |
|---|---|
| FLUOROTELOMER CONSORTIUM )<br><br>     *Petitioner*,                             )<br><br>     v.                                       )<br><br>U.S. ENVIRONMENTAL )<br>PROTECTION AGENCY )<br><br>     *Respondent*.                          ) | Case No. _____ |

_____

### RULE 26.1 DISCLOSURE STATEMENT OF PETITIONER

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner Fluorotelomer Consortium respectfully submits this Disclosure Statement. The Fluorotelomer Consortium is a trade association and nonprofit organization incorporated in the District of Columbia for the purpose of representing manufacturers and processors of fluorotelomer substances and related chemistries to respond to and comply with test orders issued by the U.S. Environmental Protection Agency (EPA) to members of the Fluorotelomer Consortium, which includes the Toxic Substances Control Act (TSCA) Section 4(a) Test Order for the chemical substance 6:2 Fluorotelomer acrylate. The Fluorotelomer Consortium has no parent company, subsidiary, or affiliates. No publicly held company has a ten percent or greater ownership interest in the Fluorotelomer Consortium.

3

Respectfully submitted,

Dated: December 9, 2024            */s/ Kelly N. Garson*
                                   *Counsel for Petitioner Fluorotelomer*
                                   *Consortium*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 15(c) and 25, Circuit Rule 15, and 40 C.F.R. § 23.12, I hereby certify that on December 9, 2024, I electronically filed the foregoing Petition for Review and Rule 26.1 Disclosure Statement with the Clerk of the Court by using the Case Management/Electronic Case File (CM/ECF) system and will cause a copy of the foregoing Petition for Review to be served by certified mail, return receipt requested, upon each of the following:

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

The Honorable Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

The Honorable Todd Sunhwae Kim
Assistant Attorney General
Environmental and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530

Dated: December 9, 2024                    */s/ Kelly N. Garson*
                                           *Counsel for Petitioner Fluorotelomer*
                                           *Consortium*

**EXHIBIT A**

U.S. Environmental Protection Agency, *Order under Section 4 of the Toxic Substances Control Act (TSCA)* (dated October 8, 2024, effective October 13, 2024).



**ASSISTANT ADMINISTRATOR FOR CHEMICAL SAFETY AND POLLUTION PREVENTION**

WASHINGTON, D.C. 20460

October 8, 2024

**Order under Section 4 of the Toxic Substances Control Act (TSCA)**

**Chemical Substance Subject to this Order:**

**Chemical Name**: 3,3,4,4,5,5,6,6,7,7,8,8,8-Tridecafluorooctyl prop-2-enoate

**Chemical Name Synonym(s)**: 6:2 Fluorotelomer acrylate, (perfluorohexyl)ethyl acrylate, 1,1,2,2-tetrahydroperfluorooctyl acrylate, 1*H*,1*H*,2*H*,2*H*-perfluorooctyl acrylate, 2-(perfluorohexyl)ethyl acrylate

**Chemical Name Acronym**: 6:2 FTAc

**Chemical Abstracts Service Registry Number (CASRN)**: 17527-29-6

**Docket Identification (ID) Number**: EPA-HQ-OPPT-2024-0364
(To access the docket, go to https://www.regulations.gov)

**Testing Required by this Order:**

Testing is listed by physical-chemical properties, environmental fate and behavior, and health effects study types: health effects testing is further listed by exposure route. All tests listed under Tier 1.1 are required as part of the initial response to the Order. Further testing under Tiers 1 and 2 will be performed in accordance with the decision logic shown in **Figures 1** and **2** of **Section V.A**.

1. Physical-Chemical Properties

*Tier 1.1- required testing*

    a. Melting point/ melting range (**OECD 102 (1995)**)

    b. Boiling point (**OECD 103 (1995)**)

    c. Vapor pressure (**OECD 104 (2006)**) as applicable to liquids

    d. Water solubility (**OECD 105 (1995)**)

e. Hydrolysis as a Function of pH (**OECD 111 (2004)**)

f. *n*-octanol/water Partition Coefficient HPLC Method, or $K_{OW}$ (**OECD 117 (2022)**)

2. Environmental Fate and Behavior

*Tier 1.1 - required testing*

a. Estimation of the Adsorption Coefficient, or $K_{OC}$, on Soil and on Sewage Sludge using High Performance Liquid Chromatography (HPLC) (**OECD 121 (2001)**)

*Tier 2.1 - required testing*

a. Bioaccumulation in Fish: Aqueous and Dietary Exposure (**OECD 305 (2012)**)

3. Health Effects: Dermal Route

*Tier 1.2 – required testing dependent on results of Tier 1.1 Hydrolysis as a Function of pH test*

a. Skin Absorption: *In Vitro* Method (**OECD 428 (2004)**)

4. Health Effects: Mechanistic for Genotoxicity

*Tier 1.2 – required testing dependent on results of Tier 1.1 Hydrolysis as a Function of pH; specific protocol may depend on results of the Tier 1.1 Vapor Pressure test*

a. Bacterial Reverse Mutation Test (**OECD 471 (2020)**)

b. One of the following:

   i. *In Vitro* Mammalian Chromosomal Aberration Test (**OECD 473 (2016)**)
   ii. *In Vitro* Mammalian Cell Micronucleus Test (**OECD 487 (2023)**)
   iii. *In Vitro* Mammalian Cell Gene Mutation Tests Using the Thymidine Kinase Gene (**OECD 490 (2016)**)

5. Health Effects: Oral and Inhalation Routes

*Tier 2.1 – required testing*

a. Toxicokinetics, oral exposure (**OECD 417 (2010)**)

*Tier 2.2 – required testing in a single rodent species dependent on TK oral study results*

b. Toxicokinetics, inhalation exposure (**OECD 417 (2010)**)

c. Combined Repeated Dose Toxicity Study with the Reproduction/Developmental Toxicity Screening Test (**OECD 422 (2016)**)

**Recipients of this Order:**

**Company Name**: Innovative Chemical Technologies

**Company Name**: The Chemours Company

**Company Name**: Daikin America, Inc.

**Company Name**: Sumitomo Corp. of Americas

**Company Name**: E.I. Du Pont de Nemours and Company

Dear Recipient:

This Order requires you and the other named manufacturer(s) and/or processor(s) of 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate (6:2 FTAc; CASRN 17527-29-6) to develop and submit certain information for 6:2 FTAc, or otherwise respond to the U.S. Environmental Protection Agency (referred to herein as "the EPA" or "the Agency"). Failure to respond to this Order, or failure to otherwise comply with its requirements, is a violation of section 15 of the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2614. Any person who violates TSCA shall be liable to the United States for penalties in accordance with TSCA Section 16, 15 U.S.C. § 2615.

This Order is **effective 5 calendar days after its date of signature by the EPA**. The timeframes and options for responding are described in **Unit IV** (Responding to this Order). Please note that the email transmitting this Order to you will provide the calendar date for the response deadlines as defined in **Unit III** (Deadlines for Responding to this Order), but the official deadlines are provided in this Order. A subsequent email will provide a company specific Order number for you to use in responses and communications about this Order.

This Order is organized as follows:

I.      Purpose and Authority ................................................................................................4
II.     Scope of TSCA Section 4 Test Order ........................................................................7
III.    Deadlines for Responding to This Order....................................................................16
IV.     Responding to This Order ...........................................................................................20
V.      Overview of Testing Required by This Order .............................................................26
VI.     Requirements of Response Option 1: Develop the Information Required by This Order............34
VII.    Fees for Submitting Information ................................................................................41
VIII.   Instructions If You Choose to Participate In A Consortium.........................................42
IX.     Confidentiality..............................................................................................................42
X.      Consequences of Failure to Comply with This Order.................................................44
XI.     References ....................................................................................................................44
XII.    Paperwork Reduction Act Notice ..............................................................................49
XIII.   For Further Information Contact ................................................................................50
XIV.    Signature ....................................................................................................................50

Appendix A – Equivalence Data ................................................................................................51

Appendix B – Cost Sharing .......................................................................................................52

Appendix C – How to Access the CDX Application and Recordkeeping Requirements...........53

Appendix D – Order Recipient Selection ..................................................................................54

Appendix E – Specific Requirements and Guidance for This Order .........................................55

Appendix F – Summary of Available Data ................................................................................70

Appendix G – Additional Underlying Information ....................................................................71

## I.      PURPOSE AND AUTHORITY

### A.   OVERVIEW

This Order is being issued under the authority of the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq*. TSCA Section 4 authorizes the EPA to require the development of necessary information related to chemical substances and mixtures.

This Order requires the identified recipients to develop and submit information on 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate (6:2 FTAc, CASRN 17527-29-6). See **Unit II** for a discussion of the scope of this Order.

Information on testing requirements is provided in **Appendix E**. The EPA encourages the formation of industry consortia to jointly conduct testing between the recipients of this Order. See **Unit VIII** for more information on this topic.

The Order requires each identified recipient to identify as a Manufacturer or Processor via an "Identification Response." A recipient who (1) does not currently manufacture or process the chemical substance(s) identified in this Order, (2) does not intend to manufacture or process the chemical substance(s) within the period of testing provided by the Order, **and** (3) has not manufactured or processed the chemical substance(s) during the 5 years preceding the date of this Order may claim to not be subject to the Order. Note that the most immediate deadline is to identify as a Manufacturer, Processor, or both—or to Claim Not Subject to the Order—within 30 calendar days after the effective date of this Order. See **Unit IV.A** for more information on this topic.

Recipients who identified as a Manufacturer or Processor of the chemical substance(s) (via the submitted "Identification Response") identified in this Order must respond using one of the three "Initial Response" options provided: Develop the Information, Submit Existing Information, or Request an Exemption. General information on these response options is provided below. Detailed information on each of these options, including their requirements (as applicable), is provided in **Unit IV.B**.

### Option 1: Develop the Information

Use this option when you intend to develop information in response to all of the requirements of this Order that apply to you or use this option in conjunction with other response options identified

in this section as appropriate. This option is available if you are conducting the testing on your own or as part of a consortium.

Manufacturers who are required to test a chemical substance or mixture pursuant to a TSCA Section 4 order are also required to pay a fee (see **Unit VII**).

## Option 2: Submit Existing Information

Use this option to submit an existing study and/or other scientifically relevant information that you believe the EPA has not considered, along with supporting rationale that explains how the submittal(s) meets part or all of the information described as necessary in **Unit II**. If the EPA determines that the submitted information satisfies one or more data requirements identified by this Order, the Agency will extinguish any associated test requirement(s).

## Option 3: Request an Exemption

Any person required by this Order to conduct tests and submit information on a chemical may apply for an exemption from a requirement of the Order to conduct testing. An exemption is not a removal of all responsibility from this Order. Rather, the exemption is a means by which an entity may forgo conducting the required testing if another person has submitted or will submit such testing under Section 4 of TSCA. A person who is granted an exemption may be required to reimburse the person(s) who submit(s) the required testing or another exemption holder who reimbursed a data submitter.

### B. TERMINOLOGY USED IN THIS ORDER

The term "manufacture" means to import into the customs territory of the United States, to produce, or to manufacture. 15 U.S.C. § 2602(9). Import also includes importing the chemical as an impurity in an article.

The term "process" means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce—(A) in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or (B) as part of an article containing the chemical substance or mixture. 15 U.S.C. § 2602(13).

There is no *de minimis* volume or concentration that would be excluded from this definition of "process." Additionally, if a chemical substance or mixture containing impurities is processed for commercial purposes, the impurities also are processed for commercial purposes.

The term "distribution in commerce" means to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce. 15 U.S.C. § 2602(5). As examples, this term includes selling to other entities that may further process the subject chemical substance as

well as distribution to sites owned and/or operated by the processing company where a commercial advantage is obtained by such distribution.

The term "chemical" or "substance" means a chemical substance or a chemical substance in a mixture.

The term "Order recipient" refers to a company listed on the Order. In regard to the testing requirements, any consortium representing Order recipients will be considered the Order recipient.

### C. PERSONS SUBJECT TO THIS ORDER

#### 1. Persons Identified

An order issued under Section 4(a) of TSCA may require the development of information by any person who manufactures or processes, or intends to manufacture or process, a chemical substance or mixture subject to the Order. The recipients of this Order are listed at the top of the Order.

Section 4(b)(3) authorizes EPA to require testing from companies that manufacture or process a chemical substance subject to a Section 4(a) Order. A company does not have to be manufacturing or processing the substance at the time the Order is issued to be considered a company that manufactures or processes the substance (see Policies Regarding Manufacturers and Processors Subject to TSCA Section 4(a) Testing, https://www.epa.gov/system/files/documents/2022-08/Policy_Manufacturing_Processing_August_2022.pdf). Generally, the EPA typically includes companies who have manufactured or processed a chemical substance during the five years prior to the effective date of the issued Order, though the Agency may apply a longer or shorter period of time when appropriate in specific cases.

For purposes of this Order, a recipient is subject if it has manufactured or processed the chemical at any time during the 5 years preceding the date of this Order. If a recipient of this Order has not manufactured or processed the chemical during the prior 5 years, the recipient is nevertheless subject to the Order if they intend to manufacture or process the chemical within the period of testing provided by this Order.

A person who contracts with a producing manufacturer to manufacture or produce a chemical substance is also a manufacturer if (1) the producing manufacturer manufactures or produces the substance exclusively for that person, and (2) that person specifies the identity of the substance and controls the total amount produced and the basic technology for the plant process.

A producing manufacturer is one who physically manufactures the chemical substance and generally provides the site, staff, and equipment necessary to manufacture the chemical substance.

A recipient who is an importer of record of a chemical substance identified by this Order is responsible for the testing requirements of this Order, even if the recipient does not store, handle, use, or otherwise directly deal with the chemical.

The means by which the EPA identified each recipient subject to this Order does not govern whether a recipient is subject to this Order. Ultimately, any recipient that meets the criteria discussed in this section is subject to this Order, regardless of the basis on which the EPA identified the recipient.

### 2.  Corporate Structure of Recipients; Changes of Ownership

The EPA has attempted to identify the highest-level U.S. corporate entity for purposes of issuing this Order. The highest-level U.S. corporate entity is ultimately responsible for satisfying the obligations of this Order, although the highest-level U.S. corporate entity may delegate its responsibilities under this Order to a U.S. subsidiary. Where the corporate entity named in this Order is not the highest-level U.S. corporate entity, the EPA nonetheless considers notification of the company named in this Order to constitute notification of the highest-level U.S. corporate entity and holds both the identified company and the highest-level U.S. corporate entity ultimately responsible for satisfying the obligations of this Order.

In the event of mergers, acquisitions, or other transactions that create a corporate successor in interest (subsequent to the manufacturing or processing that triggered the reporting obligation, and either before or after receipt of this Order), that successor in interest is responsible for satisfying the obligations of this Order. The successor in interest must notify the EPA of its identity within 14 days following the transaction.

## II.    SCOPE OF TSCA SECTION 4 TEST ORDER

### A.  STATUTORY STANDARD

Under section 4(a)(1)(A)(i) of TSCA, the EPA shall require testing of a chemical substance or mixture to develop appropriate test data if the Administrator finds that:

(I)   The manufacture, distribution in commerce, processing, use, or disposal of a chemical substance or mixture, or that any combination of such activities, may present an unreasonable risk of injury to health or the environment,

(II)  There is insufficient information and experience upon which the effects of such manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted, and

(III) Testing of such substance or mixture with respect to such effects is necessary to develop such information.

In making section 4(a)(1)(A)(i) findings, the EPA considers, among other things, physical-chemical properties, fate and transport, exposure, and toxicity information to make the finding that the chemical substance or mixture may present an unreasonable risk. For finding (II) above, the EPA examines whether existing information is adequate to reasonably determine or predict the effects on health or the environment from the chemical substance or mixture. In making the third finding that

testing is necessary, the EPA considers whether testing which the Agency might require is necessary to develop the needed information.

    **B. BASIS FOR THIS ORDER**

The EPA is issuing this Order on the authority of section 4(a)(1)(A)(i) of TSCA. As explained above, in **Unit II.A**, to issue an Order under section 4(a)(1)(A)(i) on a chemical substance or mixture, the EPA must make three findings, as provided below.

    **1. TSCA Section 4(a)(1)(A)(i)(I): The manufacture, distribution in commerce, processing, use, or disposal of a chemical substance or mixture, or that any combination of such activities, may present an unreasonable risk of injury to health or the environment.**

The EPA finds that the manufacture, distribution in commerce, processing, use, or disposal of 6:2 FTAc may present an unreasonable risk of injury to human health or the environment.

6:2 FTAc is a member of the group of chemicals known as per- and polyfluoroalkyl substances (PFAS). For the purposes of this Order, the EPA's Office of Pollution Prevention and Toxics (OPPT) is using a structural definition for identifying PFAS. Specifically, this definition includes substances that meet any of the following criteria:

    (i)  R-(CF$_2$)-CF(R')R", where both the CF$_2$ and CF moieties are saturated carbons

    (ii)  R-CF$_2$OCF$_2$-R', where R and R' can either be F, O, or saturated carbons

    (iii) CF$_3$C(CF$_3$)R'R", where R' and R" can either be F or saturated carbons

Note that agencies as well as programs within a given agency may define PFAS differently as applicable to the statute and regulatory needs. 6:2 FTAc fits the definition of PFAS provided above as well as other definitions of PFAS (*e.g.*, OECD's definition). Though definitions of PFAS may differ, PFAS based on the definition used for purposes of this Order share common toxicity concerns. As discussed below, toxicity information on other PFAS meeting the above definition contribute to the may-present finding made by this Order, along with information specific to 6:2FTAc.

The definition being used for this Order is not meant to represent an agency-wide definition but is consistent with the recent definition in a Significant New Use Rule on PFAS designated as inactive on the TSCA inventory (89 FR 1822, January 11, 2024 (FRL 9655-02-OCSPP)) and the Toxic Substances Control Act Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances rule (88 FR 70516, October 11, 2023 (FRL-7902-02-OCSPP)). The definition could be revised for future cycles of Test Orders as more information is gathered on PFAS.

**Hazard and Exposure for PFAS**

PFAS have been used in industry and consumer products since the 1940s because of their useful properties. There are thousands of different PFAS, some of which have been more widely used and

studied than others. Studies show that some PFAS may break down very slowly or break down into other PFAS that break down very slowly, and can build up in people, animals, and the environment over time (USEPA, 2022a; ATSDR, 2021).

Studies in laboratory animals indicate some PFAS can cause reproductive, developmental, liver, kidney, and immunological toxicity. In addition, exposure to some PFAS produces tumors in laboratory animals. In humans, there are consistent findings from epidemiology studies for increased cholesterol levels among exposed populations, with other limited findings related to infant birth weights, effects on the immune system, cancer (*e.g.*, Health Effects Support Document for Perfluorooctanoic Acid (PFOA) (USEPA, 2016b)), and thyroid hormone disruption (*e.g.*, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS) (USEPA, 2016a)). In humans and animals, some PFAS can cause adverse effects on the respiratory system following acute inhalation exposures (*e.g.*, corrosion, chemical pneumonitis) (NLM, 2022). In some cases, cardiac sensitization may be a concern, where the heart is damaged in a way that it becomes sensitive to epinephrine (aka adrenaline) which can lead to potentially fatal arrhythmias (ECETOC, 2009). Visit these EPA webpages for more information on general concerns associated with PFAS: PFAS Explained (USEPA, 2022b) and Our Current Understanding of the Human Health and Environmental Risks of PFAS (USEPA, 2022a).

Current research has shown that people can be exposed to PFAS by working in occupations that deal with PFAS and products containing PFAS, drinking water contaminated with PFAS, eating certain foods that may contain or be packaged in PFAS-containing materials, swallowing contaminated soil or dust, breathing air containing PFAS, and using products made with PFAS or that are packaged in materials containing PFAS (ATSDR, 2021). These exposures are compounded when populations are exposed via more than one exposure route.

### Hazard for 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate (6:2 FTAc)

6:2 FTAc is part of the larger group of chemicals described above as PFAS.

Based on predicted physical and chemical properties, oral, dermal, and inhalation routes of exposure may be relevant for 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate. The EPA examined whether existing information is adequate to reasonably determine or predict the effects on health from 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate. The EPA considered all reasonably available human health-related toxicity studies identified in the following hazard domains:

- Acute Toxicity
- Subchronic Toxicity
- Chronic Toxicity including Cancer Bioassays
- Developmental Toxicity
- Reproductive Toxicity
- Immunotoxicity
- Neurotoxicity
- Toxicokinetics
- Mutagenicity

- Sensitization/Irritation

The EPA queried for toxicity data from two sources – the EPA Toxicity Value Database (ToxValDB) (Judson, 2018) and the EPA Chemical Information System (CIS). The EPA ToxValDB is a compilation of publicly-derived experimental toxicity data on ~34,000 chemicals from 43 distinct sources including U.S. EPA, U.S. Food and Drug Administration (FDA), California Office of Environmental Health Hazard Assessment (OEHHA), Agency for Toxic Substances and Disease Registry (ATSDR), Department of Energy (DOE), California Department of Public Health (DPH), the World Health Organization (WHO), Health Canada, the European Chemicals Agency (ECHA), European Food Standards Agency (EFSA), and the European Commission's Cluster of Systems of Metadata for Official Statistics (COSMOS) database. These sources include toxicity data from the scientific literature, reports, regulatory toxicology study submissions, or government-sponsored studies (*e.g.*, U.S. National Toxicology Program). The EPA CIS is an internal platform for managing data submissions under TSCA, including toxicity studies. Most of the data within CIS have been provided by industry in conjunction with TSCA submissions and are not currently publicly available. The EPA also considered additional toxicity data provided by the Test Order recipients before issuance of the Test Order. The data provided by Test Order Recipients which the EPA considered for the data needs specified in this Order are publicly available at the Regulations.gov docket specific for this Order.

Pursuant to the requirements specified at TSCA sections 4(h)(1)(A) and 26(k), reasonably available information was considered prior to issuance of this 6:2FTAc Test Order. Several robust study summaries relevant to hazard characterization were retrieved from the ECHA Registered Substances Database and are described in **Appendix F**. The robust study summaries reported a 28-day oral exposure to 6:2 FTAc increased Sprague-Dawley rat liver and kidney size with numerous histopathological and hematological effects. Further, this 28-day study in female and male Sprague-Dawley rats, provided as a robust study summary, also reported behavioral effects, specifically reduced spontaneous locomotion in both sexes and more frequent defecation by males following administration of 6:2 FTAc. While the records retrieved summarized experimental findings, the underlying study reports and data were unavailable for review. Thus, the robust study summaries obtained from ECHA for review were unable to meet the data needs of this Order.

Increased risk of certain types of cancer are associated with exposure to some PFAS (USEPA, 2022a). The EPA's carcinogenicity expert system, OncoLogic™ 9, predicts 6:2 FTAc to have low to moderate concern for cancer via oral and dermal exposures and moderate concern for cancer via inhalation exposures based on the acrylate moiety (**Appendix G**). It should be noted that generally PFAS are known to have unique properties which may impact the applicability of certain models (Dawson et al., 2023; Sosnowska et al., 2023).

6:2 FTAc is a fluorotelomer acrylate with an expected biotransformation pathway analogous to that of 8:2 FTAc (Royer et al., 2015). The biotransformation pathway of 6:2 FTAc includes hydrolysis of the ester linkage to form 6:2 fluorotelomer alcohol (FTOH), degradation of 6:2 FTOH to perfluorohexanoic acid (PFHxA) and other short-chain perfluoroalkyl carboxylic acids (PFCAs) as stable transformation products (Zhang et al., 2013; Zhao et al., 2013b; Zhao et al., 2013a; Liu et al., 2010b; Liu et al., 2010a).

In summary, for 6:2 FTAc, the EPA identified hazards for potential carcinogenic and toxic effects on specific target organs following exposure through routes outlined above, and related concerns for health effects from its biotransformation products, including PFHxA.

**Exposure for 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate (6:2 FTAc)**

Section 8(b)(4)(A) of TSCA required the EPA to designate as "active" in commerce any chemical substance manufactured or processed within a specified ten-year period, based on information provided by manufacturers and processors of such chemical substances. 6:2 FTAc is listed as "active" on the TSCA Inventory, as a result of this reporting, indicating a potential for exposure. Additionally, Chemical Data Reporting (CDR) indicates that 6:2 FTAc is manufactured (defined to include importing) in quantities of approximately 1,000,000 – <20,000,000 pounds each year and is used as a reactant for plastics and resin manufacturing; manufacturing of textiles, apparel, and leather; and in other basic organic chemical manufacturing. CDR also indicates manufacturing, processing, use, disposal, and/or distribution activities in commerce of the test substance may lead to dermal, oral, and inhalation exposures to workers (see "Type of Process or Use" and "Number of Workers Reasonably Likely to be Exposed" data elements). Further, the chemical substance is incorporated into a variety of products that may also present potential exposures to the general population and consumers beyond the sites reporting to CDR. Concern for 6:2 FTAc's exposure potential is discussed further below.

Based on modeled estimates of physical-chemical property values for 6:2 FTAc using the EPA's model, [Open (Quantitative) Structure-activity/property Relationship App (OPERA v 2.9),](#) the EPA tentatively concludes it is a liquid at room temperature with the following properties:

- Vapor pressure:        0.33 mmHg (estimated by OPERA)
- Water solubility:       0.37 mg/L (estimated by OPERA)
- Melting point:          -20°C (estimated by OPERA)
- Boiling point:          205 °C (estimated by OPERA)
- Henry's Law:            0.00072 atm-m$^3$/mol (estimated by OPERA)

In addition to estimated physical-chemical properties, experimental data are included in robust study summaries for freezing, flash, and boiling points, auto-flammability, viscosity, vapor pressure, $n$--octanol/water partition coefficient ($K_{ow}$), and water solubility. However, these available robust study summaries did not meet the requirements of this Order as underlying data and detailed experimental methods were unavailable for review. The EPA is considering this information qualitatively, as these data tentatively confirm the physical state of 6:2 FTAc; vapor pressure, boiling point, melting point, and water solubility reported in the robust study summaries generally agreed with the estimated OPERA values. Exposure via all routes, including oral, dermal, and inhalation are of potential concern for liquid substances, including 6:2 FTAc, and are data needs addressed in this Test Order.

While fluorotelomer acrylates are typically reactive chemicals ([Young and Mabury, 2010](#)), 6:2 FTAc has been found in consumer products and environmental media, including air and water, supporting potential oral, dermal, and inhalation exposure concerns. Oral exposure to industrial chemicals,

including 6:2 FTAc, can potentially occur through multiple scenarios, such as drinking water ingestion from surface water sources, drinking water ingestion from wells impacted by landfill leachate, and fish ingestion when a chemical is bioaccumulative (USEPA, 2012). Hand-to-mouth activity can also lead to oral exposures, especially in infants, which may be relevant for treated objects and surfaces (USEPA, 2011). Schwartz-Narbonne et al., (2023) measured 6:2 FTAc in various food wrapper items. Limited monitoring information is available on 6:2 FTAc in surface waters, but it has been reported in seawater (Xie et al., 2013). Other fluorotelomer acylates (*i.e.*, 8:2 FTAc) and fluorotelomer alcohols, (*e.g.*, 6:2 FTOH, of which 6:2 FTAc is a precursor) have been reported in the influent and effluent of municipal wastewater treatment plants in France (Dauchy et al., 2017) and China (Chen et al., 2020; Chen et al., 2017). The potential application of biosolids can lead to releases to surface and groundwater, as well as uptake into fertilized crops (Ye et al., 2024). One study on soil spiked with 6:2 FTAc suggested uptake by maize (Just et al., 2022).

Dermal exposure is a data need for PFAS, generally (Kissel et al., 2023; Chen et al., 2022; Ragnarsdóttir et al., 2022; ATSDR, 2021). 6:2 FTAc has been used as a waterproofing agent (van der Veen et al., 2022) and has been detected in Canadian food wrappers (Schwartz-Narbonne et al., 2023) and North American clothing items (Xia et al., 2022). Xia et al., (2022) reported finding measurable concentrations of 6:2 FTAc in Canadian and U.S. children's school uniforms and Wu et al., (2021) reported 6:2 FTAc in children's car seat fabric and foam across 18 models marketed in the U.S. Lastly, Whitehead et al. (2021) reported measurable 6:2 FTAc concentrations within foundation, lip, and mascara makeup products. As data for the dermal uptake of 6:2 FTAc is lacking, there remains a need to understand the dermal toxicokinetic behavior of 6:2 FTAc.

Inhalation is often a concern for PFAS, in general, as these substances are frequently present in indoor air and dust. While domestic monitoring data for 6:2 FTAc is not available, international studies confirm that it can be found in residential and nonresidential indoor air (Winkens et al., 2017; Fromme et al., 2015; Langer et al., 2010). Further, 6:2 FTAc has been reported in air at waste management infrastructure (*e.g.*, landfills, wastewater treatment plants) in the southeastern U.S. (Titaley et al., 2023), China (Lin et al., 2022), and Germany (Weinberg et al., 2011). As 6:2 FTAc has been measured in indoor and outdoor air, there is a need to understand its toxicokinetic behavior following inhalation.

As an example of its potential for long-range transport, 6:2 FTAc was reported in outdoor air over the Western Antarctic Peninsula (Del Vento et al., 2012), the northern South China Sea (Lai et al., 2016), and the North Sea (Xie et al., 2013; Dreyer and Ebinghaus, 2009). Fluorotelomer acrylates (6:2, 8:2, and 10:2) comprised 6-11% of all gaseous polyfluorinated organic compounds sampled in marine air over the North Sea (Dreyer and Ebinghaus, 2009).

Because of the potential for adverse effects following short-term exposure and the potential for exposure, based in part on the predicted physical-chemical properties, via oral, inhalation and dermal routes of exposure, there is a potential for risk. As summarized in the above hazard and exposure sections, to evaluate potential exposures to 6:2 FTAc, the Agency considered: (a) its status on the TSCA Inventory and (b) reporting on the substance under the Chemical Data Reporting Rule and (c) reported monitoring information in outdoor and indoor environmental media.

Given the hazard and exposure concerns identified for 6:2 FTAc, as discussed above, the EPA finds that 6:2 FTAc may present an unreasonable risk of injury to health or the environment. The hazard and exposure concerns for PFAS generally further support this conclusion.

**2. TSCA Section 4(a)(1)(A)(i)(II): There are insufficient information and experience upon which the effects of such manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted.**

The testing required by this Order addresses only the insufficient data that has been identified in the process of developing this Order. The EPA may in the future determine the availability of data and experience upon which the effects of such manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted is insufficient for other hazard endpoints and exposure scenarios.

Robust study summaries from acute, short-term, and chronic toxicity studies, as well as those examining physical-chemical properties and environmental fate and behavior, were identified (**Appendix F**). While the toxicity study summaries indicated effects following 6:2 FTAc exposure on rodent liver and kidney size, as well as numerous histopathological, hematological, and behavioral endpoints, the underlying study reports and data were unavailable to the EPA for data quality review. As such, the robust study summaries are unable to inform the specific health effects of concern the EPA has identified for PFAS, and for 6:2 FTAc in particular (**Unit II.B.1**). Thus, *Tier 2.1* consists of a toxicokinetics study in two species to identify the most relevant rodent species for later *in vivo* testing and will provide an estimate of half-life and identify metabolites of 6:2 FTAc. *Tier 2.2* consists of an OECD 422 Combined Repeated Dose Toxicity Study with the Reproduction/Developmental Toxicity Screening Test, which covers a large number of endpoints known to be relevant to PFAS in a single guideline and can be used as the basis for follow-up definitive toxicity testing.

**3. TSCA Section 4(a)(1)(A)(i)(III): Testing of such substance or mixture with respect to such effects is necessary to develop such information.**

The EPA finds that testing of 6:2 FTAc —as described in **Appendix E** and listed at the beginning of this Order—is necessary to ascertain physical-chemical properties and develop human health-related toxicity data that the EPA requires to determine or predict the effects discussed in this Order. Further details as to the purpose of each required test of this Order are discussed in **Unit V**.

**C. OTHER USES OF THIS DATA: PFAS TERMINAL CATEGORIES**

The EPA developed the National PFAS Testing Strategy: Identification of Candidate Per- and Polyfluoroalkyl Substances (PFAS) for Testing (Testing Strategy; (USEPA, 2021a)) to deepen the understanding of the impacts of PFAS, including potential hazards to human health and the environment, to address variation among effects seen for various endpoints for different PFAS (*e.g.*, Per- and Polyfluoroalkyl Substance Toxicity and Human Health Review: Current State of Knowledge and

Strategies for Informing Future Research; (Fenton et al., 2021)), and to aid the EPA in identifying and selecting PFAS for which the Agency will require testing.

The Testing Strategy categorizes PFAS based on the information on chemical structure and certain physical-chemical properties. As described in the Testing Strategy (USEPA, 2021a), the EPA used computer software developed by Su and Rajan, (2021) to systematically analyze the chemical structures of over 10,000 PFAS into nine primary categories and one additional category denoted as "Others." This was further refined by the presence/absence of a ring substructure (cyclic/acyclic), with additional subcategorization based on carbon chain length and similarity of chemical fingerprinting, resulting in "terminal categories" of PFAS.

Using this approach, the EPA categorized 6:2 FTAc as belonging to the "'Fluorotelomer PFAA precursors,' 'lt 7'" terminal category. An additional factor in the initial categorization approach is substance volatility, as predicted by OPERA (Mansouri, 2022). For 6:2 FTAc, it is not predicted to be volatile under ambient conditions although inhalation concerns exist, as described above.

This Order pertains to 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctyl prop-2-enoate (6:2 FTAc, CASRN 17527-29-6). The EPA's concerns related to 6:2 FTAc, and its decision to issue this Order pursuant to TSCA Section 4(a)(1)(A)(i), may also exist for other PFAS in its terminal category. As the EPA iteratively improves its understanding of PFAS, categorization of these chemical substances will evolve. Further, the EPA may determine that testing is required on other PFAS in the same terminal category as 6:2 FTAc.

### D. ADDITIONAL TSCA SECTION 4 CONSIDERATIONS

#### 1. The EPA is reducing testing on vertebrates via grouping approaches

Section 4(h)(1)(B)(ii) states that the EPA will encourage and facilitate "the grouping of 2 or more chemical substances into scientifically appropriate categories in cases in which testing of a chemical substance would provide scientifically valid and useful information on other chemical substances in the category." The EPA's application of a category approach described in **Unit II.C** reduces the use of vertebrate animals by testing representatives of categories rather than many more individual PFAS.

#### 2. The EPA is using a tiered testing strategy

This Order includes a tiered testing approach, consistent with Section 4(a)(4) of TSCA. Developing certain information, such as physical-chemical property information (*i.e.*, water solubility, boiling point, hydrolysis, vapor pressure), initially ensures testing is applicable, exposure routes are feasible, and testing on vertebrate animals are appropriate.

Additional testing to determine the environmental fate, transport, and potential of 6:2 FTAc to bioaccumulate is also needed. Results from hydrolysis, *n*-octanol/water coefficient, water solubility, and absorption coefficient will inform the selection of appropriate methods when examining the potential bioaccumulation in fish following aqueous and dietary exposures (OECD, 2012).

The results of the *Tier 2.1* toxicokinetic study ("TK study") via oral route of exposure will be used to select the most sensitive rodent species for subsequent tiered *in vivo* testing in *Tier 2.2*. This approach to tiered testing thereby reduces vertebrate animal use by performing the TK study via the inhalation route of exposure in only one rodent species. TK information is critical for enabling route-to-route extrapolation (OECD, 2010).

Section 4(a)(4) states that tiered testing regimes may bypass earlier tiers when "information available to the Administrator justifies more advanced testing of potential health or environmental effects or potential exposure without first conducting screening-level testing." For this Order, the EPA is implementing a tiered testing regime that includes screening-level testing to inform whether additional tests are necessary. Later tiers of testing are dependent on the results from earlier tiers; some testing outlined in this Order may ultimately not be required. If EPA determines, based upon results from the earlier tiers or from other information that the Agency becomes aware of, that any of the later testing tiers are unnecessary or infeasible, EPA will rescind the affected testing requirement and notify the order recipients.

### 3.  The EPA is using non-vertebrate testing

As part of this consideration of non-vertebrate approaches, consistent with section 4(h)(1) of TSCA, the EPA reviewed OCSPP test methods and data evaluation reports, OECD test guidelines and guidance, and other peer-reviewed and/or publicly available methodology/protocol repositories. In this Order, the EPA is including an *in vitro* dermal absorption test as a non-vertebrate alternative test to evaluate the importance of the dermal route of exposure for this substance. The information from the *in vitro* absorption study may eliminate the need for additional *in vivo* testing via the dermal route of exposure.

The EPA has determined that vertebrate testing is necessary for assessing the effects discussed in this Order (see below for details). Existing information and replacement methods (*e.g.*, *in vitro* toxicity information, computational toxicology and bioinformatics, high-throughput screening methods) are unavailable or cannot be used to address testing required by the Order, as discussed in greater detail below. Further information on the EPA review process that led to the inclusion of such testing requirements can be found in **Unit II.B**.

The toxicokinetic testing requires the use of vertebrates. No scientifically valid non-vertebrate test method of equivalent or better scientific quality and relevance currently exists to determine/measure internal dosimetry in rats and mice from oral, dermal, and inhalation exposures. Existing information on other PFAS (which are not the subject of this Order, but which inform the testing required by this Order) has not demonstrated a clear pattern of rodent species' relevance to human health hazard (ATSDR, 2021). In the absence of evidence that either rats or mice are more human-relevant for 6:2 FTAc exposure, experimental data are needed from both species to understand interspecies differences in accumulation, metabolism, and re-uptake and/or clearance of these substances. Testing both rats and mice is required in the initial *Tier 2.1* TK test via the oral route of exposure within this Order to select the most appropriate rodent species (*i.e.*, rat or mouse). Because inhalation is also a concern for 6:2 FTAc, a subsequent toxicokinetic study via the inhalation route of exposure is also

required, but only in the most sensitive species (the species in which 6:2 FTAc has the longer half-life, as determined by the oral TK test).

A subsequent phase of testing (post- toxicokinetics study by the oral route) also includes the OECD 422 screen. This data need requires vertebrate testing because there are currently no adequate substitutes for the reproductive endpoints. Also, reasonably available study information, including acute and repeated dose toxicity studies via the oral and inhalation routes of exposure, either did not meet study quality requirements (**Appendix F**) and/or lacked reproductive and developmental outcome measurements and observations. In addition, data needs for this Order requires measured TK data both for planning subsequent toxicity testing and identification of the most sensitive rodent species.

Because PFAS are found in aquatic systems worldwide (Kurwadkar et al., 2022; Sims et al., 2021), and are known to bioaccumulate (Brase et al., 2022; Pickard et al., 2022) and biomagnify (George et al., 2023; Miranda et al., 2022; Munoz et al., 2022) in aquatic species, the OECD TG 305, Bioaccumulation in Fish: Aqueous and Dietary Exposure (OECD, 2012), is also required testing to assess the fate of 6:2 FTAc within aquatic systems. As PFAS are known to bioaccumulate by means other than traditional lipid partitioning (Evich et al., 2022), bioaccumulation and bioconcentration predictive models based on log$K_{OW}$ or logP values are not adequate for understanding accumulation behavior of PFAS. Thus, there remains a need to understand the fate of 6:2 FTAc.

## III.     DEADLINES FOR RESPONDING TO THIS ORDER

This section describes the deadlines for this Order and possible modifications to such deadlines.

### A. DEADLINES FOR RESPONSES TO THIS ORDER

The table below provides the deadlines for this Order. Deadlines that fall on a weekend or holiday will remain and will not be extended to the next weekday. Descriptions of these response options and the required process associated with each option is provided in **Unit IV**.

**Deadlines for Responses, Study Plans, and Test Reports**

Identification Response and Initial Response Deadlines

| Order Requirement | Recipient's Deadline (Days after the effective date of the Order) | The EPA Response Deadline* (Days after the effective date of the Order) |
|---|---|---|
| Identification Response | | |
|    Identify as a Manufacturer, Processor or Both | 30 | n/a |
|    Claim that You Are Not Subject to this Order | 30 | 45 |
| Initial Response | | |
|    Choose to Submit Existing Data (Option 2) | 30 | 45 |
|    Choose to Develop the Information - On Own or as Part of a Consortium (Option 1) | 65 | n/a |
|    Request an Exemption (Option 3) | 65 | 80 |

Tier 1.1 Study Plans and Test Report Deadlines

| | Recipient's Deadline (Days after the effective date of the Order) | The EPA Response Deadline* (Days after the effective date of the Order) |
|---|---|---|
| **Tier 1.1 tests:**<br>• **Melting point/ melting range (OECD 102)**<br>• **Boiling point (OECD 103)**<br>• **Vapor pressure (OECD 104) as applicable to liquids**<br>• **Water solubility (OECD 105)**<br>• **Hydrolysis as a Function of pH (OECD 111)**<br>• ***n*-octanol/water Partition Coefficient HPLC Method, or $K_{OW}$ (OECD 117)**<br>• **Estimation of the Adsorption Coefficient, or $K_{OC}$, on Soil and on Sewage Sludge using High Performance Liquid Chromatography (HPLC) (OECD 121)** | | |
| Submit Pre-Draft Study Plan Check-in (via email)** | 95 | 110 |
| Submit Draft Study Plan | 125 | 170 |
| Submit Final Study Plan | 215 | 260 |
| Submit Final Test Report | Deadline varies per Test Requirement (See **Unit V** and **Appendix E**) | |

 *See **Unit III.B** for potential automatic extensions associated with the EPA responses.
 **See **Unit VI.B** for details.

The EPA will notify Test Order recipients in writing of their Tier 1.2 testing obligations after the evaluation of specific Tier 1.1 test results. Tier 1.2 deadlines will use the same structure as the Tier 1.1 tests. However, Tier 1.2 submission deadlines will be calculated based on the date of the EPA's notification to proceed with Tier 1.2 tests rather than the effective date of the 6:2 FTAc Test Order. Multiple Tier 1.2 notifications may be presented to Test Order recipients, based on the timing of the EPA's approval of the Tier 1.1 submissions.

Tier 1.2 Study Plans and Test Report Deadlines

| | Recipient's Deadline (Days after the EPA notification to proceed with the Tier 1.2 Testing) | The EPA Response Deadline* (Days after the EPA notification to proceed with the Tier 1.2 Testing) |
|---|---|---|
| **Tier 1.2 tests:**<br>• **Skin Absorption: *In vitro* method (OECD 428)**<br>*Following tests dependent upon OECD 111 results:*<br>• **Bacterial Reverse Mutation Test (OECD 471)**<br>• **One of the following:**<br>    ◦ ***In Vitro* Mammalian Chromosomal Aberration Test (OECD 473)**<br>    ◦ ***In Vitro* Mammalian Cell Micronucleus Test (OECD 487)**<br>    ◦ ***In Vitro* Mammalian Cell Gene Mutation Tests Using Thymidine Kinase Gene (OECD 490)** | | |
| Submit Pre-Draft Study Plan Check-in (via email)** | 30 | 45 |
| Submit Draft Study Plan | 60 | 105 |
| Submit Final Study Plan | 135 | 180 |

|  | Recipient's Deadline (Days after the EPA notification to proceed with the Tier 1.2 Testing) | The EPA Response Deadline* (Days after the EPA notification to proceed with the Tier 1.2 Testing) |
|---|---|---|
| **Tier 1.2 tests:**<br>• **Skin Absorption:** *In vitro* **method (OECD 428)**<br>*Following tests dependent upon OECD 111 results:*<br>• **Bacterial Reverse Mutation Test (OECD 471)**<br>• **One of the following:**<br>   o *In Vitro* **Mammalian Chromosomal Aberration Test (OECD 473)**<br>   o *In Vitro* **Mammalian Cell Micronucleus Test (OECD 487)**<br>   o *In Vitro* **Mammalian Cell Gene Mutation Tests Using Thymidine Kinase Gene (OECD 490)** |  |  |
| Submit Final Test Report | Deadline varies per Test Requirement (See **Unit V** and **Appendix E**) |  |

*See **Unit III.B** for potential automatic extensions associated with the EPA responses.
**See **Unit VI.B** for details.

The EPA will notify Test Order recipients in writing of their Tier 2.1 testing obligations after the evaluation of specific Tier 1 test results. Tier 2.1 deadlines will use the same structure as the Tier 1.1 tests. However, Tier 2.1 submission deadlines will be calculated based on the date of the EPA's notification to proceed with Tier 2.1 tests. Multiple Tier 2.1 notifications may be presented to Test Order recipients, based on the timing of the EPA's approval of the Tier 1 submissions.

Tier 2.1 Study Plans and Test Report Deadlines

| **Tier 2.1 tests:**<br>• **Bioaccumulation in Fish: Aqueous and Dietary Exposure (OECD 305)**<br>• **Toxicokinetics (OECD 417)** | **Recipient's Deadline (Days after the EPA notification to proceed with the Tier 2.1 Testing)** | **The EPA Response Deadline* (Days after the EPA notification to proceed with the Tier 2.1 Testing)** |
|---|---|---|
| Submit Pre-Draft Study Plan Check-in (via email)** | 30 | 45 |
| Submit Draft Study Plan | 60 | 105 |
| Submit Final Study Plan | 135 | 180 |
| Submit Final Test Report | Deadline varies per Test Requirement (See **Unit V** and **Appendix E**) |  |

*See **Unit III.B** for potential automatic extensions associated with the EPA responses.
**See **Unit VI.B** for details.

The EPA will notify Test Order recipients in writing of their Tier 2.2 testing obligations after the evaluation of specific Tier 2.1 test results. Tier 2.2 deadlines will use the same structure as the Tier 2.1 tests. However, Tier 2.2 submission deadlines will be calculated based on the date of the EPA's notification to proceed with Tier 2.2 tests rather than the effective date of the 6:2 FTAc Test Order. Multiple Tier 2.2 notifications may be presented to Test Order recipients, based on the timing of the EPA's approval of the Tier 2.1 submissions.

Tier 2.2 Study Plans and Test Report Deadlines

| Tier 2.2 tests:<br>• **Toxicokinetics (OECD 417)**<br>• **Combined Repeated Dose Toxicity Study with the Reproduction/Developmental Toxicity Screening Test (OECD 422)** | **Recipient's Deadline (Days after the EPA notification to proceed with the Tier 2.2 Testing)** | **The EPA Response Deadline\* (Days after the EPA notification to proceed with the Tier 2 .2 Testing)** |
|---|---|---|
| Submit Pre-Draft Study Plan Check-in (via email)\*\* | 30 | 45 |
| Submit Draft Study Plan | 60 | 105 |
| Submit Final Study Plan | 135 | 180 |
| Submit Final Test Report | Deadline varies per Test Requirement (See **Unit V** and **Appendix E**) | |

\*See **Unit III.B** for potential automatic extensions associated with the EPA responses.
\*\*See **Unit VI.B** for details.

### B. AUTOMATIC EXTENSIONS TO DEADLINES

Where a deadline exists for an EPA response, the recipient's deadline is automatically extended should the Agency fail to meet any EPA response deadline set forth in **Unit III.A**. Specifically, deadlines will be automatically extended should the EPA fail to respond within 15 calendar days of the deadline for a response option if the response was submitted in the CDX application prior to the deadline provided. For each day exceeding the 15-day period following the associated deadline, the deadline is extended by one day.

Should a recipient amend their response, at any time, any associated or subsequent deadlines are not extended. Therefore, the EPA recommends that recipients submit their amendments or extension requests as early as practicable to ensure adequate time to perform any required testing given that the Agency will not automatically extend deadlines for any such amendments to responses.

Deadlines will not be extended for submissions received after the deadline for the given submission. For example, a recipient may submit existing data after the 30-day deadline, but the deadline to submit a Draft Study Plan will not be extended due to the submission of the existing data. Further, the EPA is not obligated to respond within 15 days to a submission that arrives after the deadline for the given type of submission.

Other than potential automatic extensions to deadlines described here, **Unit III.C** provides the process for requesting an extension to a deadline.

### C. REQUESTING AN EXTENSION TO A DEADLINE FOR RESPONDING TO THIS ORDER

If you believe you cannot submit the required identification as a manufacturer, processor, or both; Order response; draft study plan; final study plan; or final test report to the Agency by the deadline(s) specified in this Order and intend to seek additional time to meet the requirement(s), you must submit a request to the Agency through the EPA's CDX portal as soon as you know you may need an extension. Your request must include: (1) a detailed description of the expected difficulty, including—as applicable—technical and laboratory difficulties, and (2) a proposed schedule including alternative

dates for meeting such requirement(s) on a step-by-step basis (including, but not limited to, the contact information for the laboratory/laboratories, when you first consulted with the laboratory/laboratories, and details related to the delay(s) you are experiencing).

Generally, the EPA expects that an Extension Request for submitting an Initial Response, Pre-Draft Study Plan Check-in, Draft Study Plan, Final Study Plan, or Final Test Report will be submitted 15 days or more prior to the deadline. An extension request submitted within 15 days of the deadline, outside of compelling circumstances, is less likely to be granted.

For extension requests related to the Final Test Report, in the event deviation(s) arise that are expected to prevent submission of the final test report by the applicable deadline, an extension request must be submitted no later than by the date of the next status update/check-in with the EPA. Status updates/check-ins are described in **Unit VI.B**. If the test sponsor fails to promptly submit an extension request, the Agency may require more frequent status updates/check-ins for the duration of the study.

The EPA will grant or deny deadline extension requests at its discretion. Additionally, a grant of an extension request for one milestone does not impact the deadline for a subsequent milestone.

## IV.    RESPONDING TO THIS ORDER

You are required to respond to this Order, even if you believe your company is not subject to this Order. Failure to provide a response is a violation of section 15 of TSCA.

For multi-tier Orders, individual responses are required for each tier of testing. After the EPA's notification that a subsequent tier is required in which the prescribed testing is confirmed, the EPA will provide Test Order Numbers to access the CDX reporting application module for the corresponding tier of testing of the Order. These additional Test Order Numbers will only be provided to the entities that have submitted in the first tier the response of "Develop the Information", "Submit Existing Information", or "Request an Exemption". Thus, entities that had their "Claim that You Are Not Subject to the Order" submission granted by the EPA in the first, or prior, tier will not need to resubmit a response to subsequent tiered testing requirements. Entities that are subject to subsequent tier testing must re-submit their Identification Response and submit an Initial Response to the subsequent tier testing. For subsequent tier testing, the deadline for the Identification Response and Initial Response is the deadline provided for the given tier's Pre-Draft Study Plan Check-in deadline.

### A.    STEP 1: SUBMIT AN IDENTIFICATION RESPONSE

#### Identify as a Manufacturer or Processor

You will receive an e-mail from the EPA within five days of the Order being signed (*i.e.*, by the effective date of the Order) that provides a CDX Order number for purposes of complying with this Order. Then, within 30 calendar days of the effective date of this Order, you, as a recipient of this Order, are required to respond to this Order through the EPA's Central Data Exchange (CDX) portal, informing the

Agency whether you will be responding to this Order as manufacturer, processor, or both if you manufacture and process the chemical.

### Claim that You Are Not Subject to the Order

Alternatively, you may claim that you are not subject to this Order if you do not manufacture or process the chemical(s) identified by this Order; do not intend to manufacture or process the chemical(s) within the period of testing required by this Order (see **Unit V.B**); and have not manufactured or processed the chemical(s) at any time during the 5 years preceding the effective date of this Order. An explanation of the basis for your claim, along with appropriate supporting information to substantiate that claim, must accompany your response in the CDX portal so that the EPA can evaluate the claim. Your claim must include (1) a statement explaining why your company is not subject to this Order, and (2) the certifying statement "I certify that the statements made in this letter are true, accurate, and complete. I acknowledge that any knowingly false or misleading statement may be punishable by fine, imprisonment or both under applicable law."

The statement explaining why your company is not subject to this Order must, aside from unique case-specific scenarios as described below, indicate that your company has not imported, manufactured, or processed the subject chemical substance (intentionally or unintentionally) within the 5 years prior to the effective date of this Order and does not intend to manufacture (including import) or process the chemical within the period of testing required by this Order (see **Unit V.B**). However, certain companies may have unique case-specific situations that present a compelling case that they are not "manufacturers" of the chemical substance that is subject to the action and may submit such information for the EPA's consideration. For example, a company may have gone into bankruptcy and be in the hands of receivers who do not seek to continue the company's manufacturing activities involving the chemical substance subject to the testing requirements. Such situations are anticipated to be uncommon and will be highly fact-determinant; decisions for such situations will be made on a case-by-case basis.

To assert a claim using this option, you must do so within 30 days of the effective date of this Order.

If based on the evidence you provide and other evidence available to the EPA, the Agency deems your claim to be inadequately substantiated, the EPA will deny your claim, and the original requirements and deadlines in this Order will remain. If your claim is approved, the EPA will notify you that you are not subject to this Order through CDX correspondence. The EPA expects to provide such notification within 45 days of the effective date of this Order.

### B. STEP 2: SUBMIT AN INITIAL RESPONSE

A recipient must develop information in response to the Order consistent with Option 1, unless they meet the requirements to respond using Option 2 or 3. See **Unit III** to review the deadlines for this Order. You must respond to the Order by selecting the response option(s) in the CDX application.

**Option 1: Develop the Information**

Use this option if you are conducting the testing on your own or as part of a consortium for any or all of the testing required of your company as provided in **Unit V**.

Manufacturers who are required to test a chemical substance or mixture pursuant to a TSCA section 4 order are also required to pay a fee (see **Unit VII**).

For details on the steps of this response option, see **Unit VI**. If you're a member of a consortium, see **Unit VIII**.

As applicable, it is imperative that you consult with consultants, laboratories, and any other entities necessary for conducting the testing required by this Order as soon as possible. Untimely extension requests will not be granted, and the EPA requires supporting documentation to demonstrate that consultations with laboratories was timely (*e.g.*, correspondence with the laboratory).

Note that the EPA requires a Pre-Draft Study Plan Check-in, during which you must identify the laboratory selected (*e.g.*, quote, proposal, or statement of work that documents contract or agreement between test sponsor and laboratory to develop the study plan and/or conduct the testing).

Outside of extenuating circumstances, extension requests must be made 15 days before a draft or final study plan is due. More information is available in **Unit III.C**.

For more information on this Order's required tests, required protocols/methodologies, and deadlines for submission of test reports see **Unit V** and **Appendix E**.

**Option 2: Submit Existing Information**

Use this option to submit an existing study and/or other scientifically relevant information that you believe the EPA has not considered, along with supporting rationale that explains how the submittal(s) meets part or all of the information described as necessary in **Unit II**. If the EPA determines that the submitted information satisfies one or more data requirements identified by this Order, the Agency will extinguish any associated test requirement(s).

The EPA's determination regarding whether the study and/or other relevant information satisfies part or all of the testing requirements or obviates the need for the information described as necessary in **Unit II** will be based on the weight of the scientific evidence from all relevant information reasonably available to the Agency. The Agency will notify you of its determination through CDX. If the Agency determines that the study and/or other scientifically relevant information satisfies the need in lieu of the testing required in this Order, and the original testing requirement is no longer needed, the EPA will extinguish those testing obligations from this Order that are no longer necessary, with respect to the appropriate recipients of this Order. If the study was your only testing obligation under the Order, all your obligations under this Order will be extinguished upon notification by the Agency.

If the EPA determines that the study and/or other scientifically relevant information does not satisfy that need, you must modify your response in the EPA's CDX portal to choose one of the other response options in **Unit IV** within 10 calendar days of being notified by the EPA.

This option is intended only for information you believe the Agency may not have considered that would directly satisfy the EPA's data need. This option does not apply to alternative interpretations of information already discussed in this Order, or other arguments why the EPA does not need new information unless such arguments are supported by data that you believe the Agency may not have considered. Any submission that does not depend upon new information does not extend the deadlines in the Order, regardless of whether the EPA informs the submitter that it does not satisfy the data need. If the EPA believes that existing information presented in the submission was included only for the purpose of qualifying for this option and could not reasonably be expected to obviate the need for the applicable testing requirement, the Agency will determine that the submission does not qualify for the option. Regardless of when the Agency informs the Order recipient that the submission does not qualify under the option, the applicable deadlines are not extended.

Note that the submission of existing information will not extend the deadline for the draft study plan submission for that testing requirement unless the existing information is submitted within 30 days of the effective date of the Order <u>and</u> the EPA does not respond within 45 days of the effective date of the Order. Thus, failure to submit existing information prior to the 30-day deadline will result in a need to submit a draft study plan by the 125-day deadline. See **Unit III.B** for information on the potential automatic extension of deadlines.

### Option 3: Request an Exemption

Any person required by this Order to conduct tests and submit information on a chemical may apply for an exemption from a requirement of the Order to conduct testing (see TSCA section 4(c)(1)). An exemption is not a removal of all responsibility from this Order. Rather, the exemption is a means by which an entity may forgo conducting the required testing if another person has submitted or will submit such testing under Section 4 of TSCA. If an entity believes that they should not be subject to the Order, it should have provided such a response during the Identification Response (see **Unit IV.A**).

A person who is granted an exemption may be required to reimburse the person(s) who submit(s) the required testing or another exemption holder who reimbursed a data submitter. See **Appendix B** for further details regarding cost sharing.

The EPA will grant a request for exemption from the requirement to conduct tests and submit information on a chemical substance if:

1. Information on the subject chemical or an equivalent chemical has been submitted in accordance with a rule, order, or consent agreement under TSCA section 4(a), or is being developed in accordance with such a rule, order (including this Order), or consent agreement, and

2. Submission of information by the exemption applicant would be duplicative of this information.

An exemption request must be submitted through the CDX portal and contain the following:

1. This Order number, the chemical identity, and the CAS Registry No. of the test substance subject to this Order on which the application is based.

2. The specific testing requirement(s) from which an exemption is sought.

3. The basis for the exemption request when another company(ies) has/have submitted the information or is/are developing information for the subject chemical or an equivalent chemical pursuant to a TSCA section 4(a) rule, order, or consent agreement. Your request must identify the company(ies) that submitted or is/are developing the information. Note that you may have an obligation to reimburse any companies that complied with the requirement to submit information to the EPA.

4. The chemical identity of the equivalent chemical (the test substance in the information submitted or being developed) on which the application is based.

5. The equivalence data (chemical data or biological test data intended to show that two substances or mixtures are equivalent (see Appendix A)) if data on an equivalent chemical is being submitted.

6. The name, mailing address, telephone number, and e-mail address of applicant.

7. The name, mailing address, telephone number, and e-mail address of appropriate individual to contact for further information.

8. A Statement of Financial Responsibility: The following sworn and signed statement (additionally, this statement must be notarized if the signatory is not the person submitting the response in CDX) must accompany each request for an exemption:

   "*I understand that if this application is granted, I must pay fair and equitable reimbursement to the person or persons who incurred or shared in the costs of complying with the requirement to submit information that obviates the need for the exemption holder to develop new, duplicative, information.*"

The EPA's grant of an exemption is conditional upon the completion of the required tests according to the specifications of this Order (or other applicable rule, order, or consent agreement), including any modifications approved by the EPA. If the Agency subsequently determines that equivalent data has not been submitted in accordance with the applicable rule, order, or consent agreement, the Agency will provide notice through CDX of its preliminary decision to terminate the exemption. Within 30 days after receipt of such notice, the exemption holder may submit information in the CDX portal to either rebut the EPA's preliminary decision to terminate the exemption or notify the EPA of its intent to develop the required information pursuant to the specifications established in this Order and any modifications approved by the EPA. If the exemption holder submits information to rebut the EPA's preliminary decision to terminate the exemption, then the EPA will provide the exemption holder an

opportunity to request a hearing prior to issuing a final decision to terminate the exemption. Following the receipt of information to rebut the EPA's preliminary decision and any subsequent hearing, the EPA will render a final decision on whether to terminate the exemption, taking into account information submitted to rebut the EPA's preliminary decision and information presented at any hearing, as applicable. The Agency may, at its discretion, make use of procedures and standards applicable to exemptions regarding TSCA Section 4 rules, contained in 40 CFR part 790, subpart E.

If an exemption holder receives the Agency's preliminary decision to terminate the exemption and does not submit information to rebut that preliminary decision or request a hearing, or if an exemption holder receives the Agency's final decision to terminate the exemption following the submission of information to rebut that preliminary decision or a hearing, the exemption holder must resubmit a response in accordance with one of the options described in **Unit IV.B** of this Order within 30 calendar days of receipt of the Agency's decision to terminate the exemption, including as applicable the information required under **Unit V** of this Order. Failure to timely resubmit the response will constitute a violation of this Order and of TSCA section 15(1). Should the EPA terminate the exemption, a draft study plan will be due 30 days from the termination, with the final study plan being due 60 days from the termination.

If the EPA extinguishes a testing obligation pursuant to **Unit IV.B.2** of this Order (submission of existing information), the corresponding exemption will be extinguished, as the exemption will no longer be necessary. In such a situation, companies who requested an exemption from that specific testing obligation are not required to reimburse the company that submitted existing information.

As explained in **Appendix B** on Cost Sharing, persons who receive exemptions from testing have an obligation to reimburse the person(s) who perform the required testing and submit the required information for a portion of the costs incurred in complying with the requirement to submit such information, and any other person required to contribute to a portion of such costs. Entities that have incurred costs in complying with a testing requirement in this Order may seek reimbursement from exemption holders as soon as they receive the EPA's notification that the applicable testing requirement has been satisfied by the submitted Final Test Report. Normally, reimbursement allocation is worked out by the parties involved without the involvement of the EPA. However, if agreement cannot be reached on the amount or method of reimbursement, and the company who is entitled to reimbursement requests in accordance with the procedures in **Appendix B** that the EPA order reimbursement, the Administrator shall order the person granted the exemption to provide fair and equitable reimbursement. See TSCA section 4(c). Note that the EPA has promulgated regulations that explain how the EPA views fair and equitable reimbursement in the context of TSCA Section 4(a) test rules. In general, those regulations (40 CFR § 791.40 through § 791.52) make a presumption that a person's fair share of the test costs is in proportion to their share of the total production volume of the test chemical over a specified period of time that begins one calendar year before the effective date of the rule and continues up to the latest data available upon resolution of a dispute.

## V.     OVERVIEW OF TESTING REQUIRED BY THIS ORDER

This unit applies to Option 1: Develop the Information and Option 2: Submit Existing Information (**Units IV.B.1** and **IV.B.2**).

Where the required protocol is an EPA guideline, the guideline is available on the [EPA OCSPP Test Guideline website](#) ([USEPA, 2015](#)) or from the National Technical Information Service (NTIS), Attn: Order Desk, 5285 Port Royal Road, Springfield, VA 22161 (tel: 703-605-6000). This EPA website also provides information on OECD guidelines, alternatively available via [OECD Guidelines for the Testing of Chemicals](#) ([OECD, 2018a](#)). **Appendix E** provides additional sources for guidelines and/or other requirements associated with specific testing.

The EPA reserves the right to extinguish specific testing obligations where existing information subsequently comes to the Agency's attention that in the EPA's scientific judgment obviates the need for specific test data required under this Order. Additionally, the EPA may extinguish testing requirements due to other reasons (*e.g.*, testing becomes infeasible due to previously unforeseen technical considerations), in the discretion of the Agency.

See **Appendix E** for details on the required test protocols.

### A.     OVERVIEW OF TEST REQUIREMENTS

Initial measurements of physical-chemical properties ensure subsequent testing is applicable, exposure routes are relevant and feasible, and testing on vertebrate animals are appropriate.

#### 1.     Physical-Chemical Properties

Estimated physical-chemical properties tentatively indicate 6:2 FTAc is an insoluble liquid, and exposure via all routes of exposure, including oral, dermal, and inhalation are of potential concern for this substance and are data needs addressed in this TO. Physical-chemical property testing information from robust study summaries, including testing for water solubility, *n*-octanol/water partition coefficient ($K_{OW}$), and melting/freezing range, did not meet the requirements of this Order (**Appendix F**). The EPA is considering this information qualitatively rather than quantitatively as these data tentatively confirm the physical state of 6:2 FTAc; vapor pressure, boiling point, melting point, and water solubility reported in the robust study summaries generally agreed with the estimated OPERA values. All physical-chemical property testing remain data needs for this Order and the measured results are required to prepare the subsequent tiers of testing study plans. The rate of hydrolysis, as measured in the OECD 111 (Hydrolysis as a function of pH; ([OECD, 2004a](#))) influences test substance stability, applicability for *in vitro* dermal absorption testing, and fate and transport in environmental media, as well as other parameters important for determining dosimetry and toxicity.

*Tier 1.1* Physical-chemical property testing includes the following:

- Melting Point/Melting Range (**OECD 102 (1995)**) ([OECD, 1995b](#))

- Boiling Point (**OECD 103 (1995)**) ([OECD, 1995c](#))

- Vapor Pressure (**OECD 104 (2006)**) ([OECD, 2006](#))

- Water Solubility (**OECD 105 (1995)**) ([OECD, 1995a](#))

- Hydrolysis as a Function of pH (**OECD 111 (2004)**) ([OECD, 2004a](#))

- *n*-octanol/water Partition Coefficient HPLC Method, or $K_{OW}$ (**OECD 117 (2022)**) ([OECD, 2022](#))

      **2.**  **Environmental Fate and Behavior: Adsorption/Desorption**

*Tier 1.1*

- Estimation of the Adsorption Coefficient, or $K_{OC}$, on Soil and on Sewage Sludge using High Performance Liquid Chromatography (HPLC) (**OECD 121 (2001)**) ([OECD, 2001](#))

      **3.**  **Health Effects: Dermal Route**

*Tier 1.2*

- Skin Absorption: *In Vitro* Method (**OECD 428 (2004)**) ([OECD, 2004b](#))

      **4.**  **Health Effects: Mechanistic for Genotoxicity**

*Tier 1.2*

- Bacterial Reverse Mutation Test (**OECD 471 (2020)**) ([OECD, 2020](#))

- *In Vitro* Mammalian Chromosomal Aberration Test (**OECD 473 (2016)**) ([OECD, 2016b](#))

- *In Vitro* Mammalian Cell Micronucleus Test (**OECD 487 (2023)**) ([OECD, 2023](#))

- *In Vitro* Mammalian Cell Gene Mutation Tests Using the Thymidine Kinase Gene (**OECD 490 (2016)**) ([OECD, 2016c](#))



**Figure 1. Tiering of tests in the Order:** *Tier 1.* Testing in this Order is sequential. Results of *Tier 1.1* tests must be known before study plans can be developed for sub-tier tests in *Tier 1.2*. Each sub-tier is a checkpoint where the Agency and the recipients subject to this Order will confer regarding the design of later studies. *Tier 1.1* tests are shown in parallelograms, and *Tier 1.2* tests in rectangles (see 'Key' top left corner of Figure 1). Decision points are in diamonds.

The hydrolysis as a function of pH is important for several reasons, including but not limited to: 1) it is a key parameter when assessing route-specific exposure pathways (*i.e.*, inhalation, oral, dermal) and extrapolating between routes; 2) it is a measure of stability in environmental media (*e.g.*, drinking water, air); 3) it is relevant to the design of later *in vitro* tests carried out in aqueous media (*e.g.*, skin absorption); 4) rapid hydrolysis to other degradants, including other PFAS-/PFOA-related products, may determine whether subsequent testing is needed or if read-across is feasible and appropriate. Study plans should track the parent test substance and avoid loss of more than 50% of the parent compound 6:2 FTAc due to hydrolysis during the course of *in vitro* testing in aqueous media, which may cause a false negative result due to deactivation of the test chemical. While worth noting, these loss concerns may be minimal given that the one *in vitro* test in *Tier 1* testing for this Order, dermal absorption, allows for the application of the parent test substance as a neat liquid.

Additional importance of *Tier 1* physical-chemical property testing includes characterizing the environmental fate, transport, and potential of 6:2 FTAc to bioaccumulate. Required testing includes the partition coefficient in *n*-octanol/water and the absorption coefficient.

The data available for the EPA to review on 6:2 FTAc did not contain any genotoxicity studies of acceptable quality. This leads to uncertainties around genotoxicity and carcinogenicity of this substance. As such, genotoxicity testing is also a requirement for testing in this Order.

### 2. Environmental Fate and Behavior: *In Vivo* Degradation and Accumulation

*Tier 2.1*

- Bioaccumulation in Fish: Aqueous and Dietary Exposure (**OECD 305 (2012)**) ([OECD, 2012](#))

  This test evaluates the potential for bioaccumulation of substances in an aquatic species through direct aqueous or dietary exposure. The two-phase controlled laboratory test assesses the uptake and depuration of the test substance over time in fish. Most importantly, this test aims to minimize animal use (305 II) and can accommodate test substances with low water solubility by providing methods for dietary exposure (305 III). The study plan must include a control group and exposure group which will be subsampled at various time points in the uptake and depuration phases. Each treatment group should contain, at minimum, enough individuals for four (aqueous exposures) or five (dietary exposure) fish at each sampling event to be assessed for growth (mass and length), lipid content, and tissue analysis (*i.e.*, whole-body concentration). Appropriate test design, exposure duration, dose concentration (*i.e.*, subchronic), and analytical techniques can be derived using available toxicity and kinetic data. A dietary exposure (305 III) with flow-through design may be appropriate if toxicity and kinetic data indicate the test substance is not stable in water or has low water solubility. Following uptake and depuration, fish (*i.e.*, whole body), food, and water concentrations, including concentrations for the test substance and major metabolites, steady-state and kinetic bioconcentration factors ($BCF_{SS}$ and $BCF_K$, respectively), and both growth- and lipid-corrected BCFs will be reported to evaluate the potential bioaccumulation of the test substance.

  The Agency is amenable to discussions regarding test design or test species (OECD TG 305 Annex 3) to limit the number of animals used and make more efficient use of other resources. Such discussions must be proposed to the EPA when the pre-draft study plan check-in is due.

### 5. Health Effects: Oral and Inhalation Routes

*Tier 2.1*

- Toxicokinetics, oral exposure (**OECD 417 (2010)**) ([OECD, 2010](#))

  Toxicokinetic studies are used to determine test substance absorption, distribution, biotransformation (*i.e.*, metabolism) and excretion to aid in the investigation into mechanisms of toxicity; oral exposure is one such route for a toxicokinetic study. In the absence of evidence that either rats or mice are more human-relevant for 6:2 FTAc exposure, experimental data are needed from both species to understand interspecies differences in accumulation, metabolism, and re-uptake and/or clearance of these substances. A pilot study must inform the parameters for the full oral TK study plan. Oral exposures should be carried out with oral gavage, ensuring

test substance concentration is no more than 1,000 mg/kg body weight and gavage volume is below 10 mL/kg body weight. A minimum of four animals per species (of each sex) should be used for each concentration that is tested. Test organisms should be housed individually in separate metabolic units. All excreta (*i.e.*, urine, feces, expired air) should be assessed for test substance and metabolite concentrations at each sampling point. Metabolites represent those found at 5% or greater of the administered dose. Following exposure, excreta collection should be conducted at least twice on Day 1 (at 24 hr post-exposure and at least once prior [*e.g.*, at hour 6, 12, 18]) and daily thereafter for 7 days or until 90% of the administered dose has been recovered, whichever occurs first. Blood and plasma samples should be obtained at appropriate intervals following oral exposure and should be analyzed for each individual animal. When no substance is detected in tissues at study termination (*e.g.*, because the substance might have been eliminated before study termination due to a short half-life), care should be taken in order to prevent misinterpretation of the data. In this type of situation, tissue distribution should be investigated at the time of test substance (and/or metabolite) peak plasma/blood concentration ($T_{MAX}$) or peak rate of urinary excretion, as appropriate (see paragraph 38 of the Test Guideline). Metabolic units should be rinsed with the appropriate solvent to collect remaining excreted test substance or metabolites. All excreta and tissue concentrations and percent recoveries, bioavailability, AUC, $C_{MAX}$, $T_{MAX}$, clearance, half-life ($t_{1/2}$), and study organism information should be reported at the conclusion of the study.

The Agency is amenable to discussions regarding changes to the timing of excreta sampling for Day 1, the number of orally administered doses, and the gavage vehicle to limit the number of animals used and make more efficient use of other resources. Such discussions must be proposed to the EPA when the pre-draft study plan check-in is due.

*Tier 2.2*

- Toxicokinetics, inhalation exposure (**OECD 417 (2010)**) (OECD, 2010)

  Toxicokinetic studies are used to determine test substance absorption, distribution, biotransformation (*i.e.*, metabolism) and excretion to aid in the investigation into mechanisms of toxicity; inhalation is one such route for a toxicokinetic study. Because inhalation is also a health concern for 6:2 FTAc, only the most sensitive species (in which 6:2 FTAc has the longer half-life) identified by the above outlined oral TK test will be used for the inhalation exposure. A pilot study must inform the parameters for the full TK study plan. To examine toxicokinetic responses following inhalation, at least four individuals (of each sex) should be outfitted with a "nose-cone" or "head-only" apparatus to prevent absorption through alternate routes. Inhalation exposure studies are typically conducted over 4-6 hr, but duration should be supported through pilot study results. The concentration and percent recovery of the test substance and metabolites and their tissue distributions should be collected as outlined above for the oral TK, with the addition of sampling the lungs and nasal tissues of exposed organisms. Following exposure, excreta collection should be conducted at least twice on Day 1 (at 24 hr post-exposure and at least once prior [*e.g.*, at hour 6, 12, 18]) and daily thereafter for 7 days or until 90% of the administered dose has been recovered, whichever occurs first. When no

substance is detected in tissues at study termination (*e.g.*, because the substance might have been eliminated before study termination due to a short half-life), care should be taken in order to prevent misinterpretation of the data. In this type of situation, tissue distribution should be investigated at the time of test substance (and/or metabolite) peak plasma/blood concentration ($T_{MAX}$) or peak rate of urinary excretion, as appropriate (see paragraph 38 of the Test Guideline).

The Agency is amenable to discussions regarding changes to the headgear used to administer the test substance and duration of inhalation exposure to limit the number of animals used and make more efficient use of other resources. Such discussions must be initiated within 30 days of submitting the test report for the oral toxicokinetics in rats and mice. This corresponds with the date of the Tier 2.2 Toxicokinetics inhalation exposure testing Pre-Draft Study Plan Check-in due date.

- TK-derived half-life < 7 days: Combined Repeated Dose Toxicity Study with the Reproductive/Developmental Toxicity Screening Test **(OECD 422 (2016)) (**OECD, 2016a**)**

This TG is designed to generate limited information concerning the effects of the test substance on male and female rodent reproductive performance, such as gonadal function, mating behavior, conception, embryonic development and parturition. The rodent species tested will be identified by the above outlined oral TK test as the most sensitive species (in which 6:2 FTAc has the longer half-life). All test organisms will be housed by sex in groups of no more than five individuals, with the exception of pregnant (housed individually) or lactating females (housed with offspring). 6:2 FTAc exposure should be administered using oral gavage, not exceed 1000 mg/kg body weight/day or 1 mL gavage volume/100 g of body weight. In contrast to the TG (*i.e.*, 28 d of exposure), repeated dosing of males should be conducted for at least twelve weeks (84 d), including ten weeks prior to mating, during mating, and, approximately, two weeks post mating up to and including the day prior to the scheduled sacrifice. Dams are tested to assess effects in pregnant and lactating females and may also provide comparative information. Females should be dosed throughout the duration of the study, including two weeks prior to mating, during mating, the conception period, the duration of pregnancy, and throughout lactation. While the TG outlines the female exposure schedule (*e.g.*, approximately 63 days), female dosing is dependent upon performance and offspring development. In contrast to the TG, $F_1$ offspring must be observed throughout weaning for continued growth and development to PND 21 (*e.g.*, approximately 71 d). The experimental design should include at least three test (exposure) groups and a control group. At least ten pregnant females per group are required, thus, it is recommended each group starts with 2-3 extra females and males. Litters should include four to five pups of each sex, and surplus pups will be used to assess serum T4 levels on Day 4 after birth. This TG includes adult rodent fertility and pregnancy data, growth and development of offspring until PND 21, and enables the examination of differences among sex. The functional observations that are listed in OECD 422 test guideline as optional are mandatory for this study.

The rodent species identified in the oral TK study will be used in this combined repeated dose toxicity study that includes reproductive/developmental screening. Dams are tested to assess effects in pregnant and lactating females and may also provide comparative information.

Body mass, behavior, and food and water consumption should be monitored throughout the duration of the experiment. Hematological examinations and biochemistry should be conducted on, at minimum, 5 individuals per sex; blood and plasma samples can be collected from males at termination, dams and two pups per litter at termination, and at least two pups per litter four days after birth (PND 4). All exposed adult animals should be necropsied, including gross observations, organ mass, and histological preparations.

If the TK-derived half-life is greater than or equal to 7 days, the OECD 422 study may require modifications under Agency advisement. Anticipated modifications may include extending the pre-mating exposure period. Extending the pre-mating exposure period may better compensate for the longer half-life of the test substance and achieve steady state of the test substance before mating occurs, in order to observe potential exposure-related reproductive and developmental effects.



**Figure 2. Tiering of tests in the Order: Tier 2.** Testing in this Order is sequential. *Tier 2.1* testing is informed by *Tier 1* results, and results of *Tier 2.1* tests must be known before study plans can be developed for sub-tier tests in *Tier 2.2*. Each sub-tier is a checkpoint where the Agency and the recipients subject to this Order will confer regarding the design of later studies. *Tier 2.1* tests are shown in parallelograms, and *Tier 2.2* tests in rectangles (see 'Key' top right corner of Figure 2). Decision points are in diamonds.

To address potential fate, transport and bioaccumulation concerns related generally to PFAS, and specifically 6:2 FTAc, environmental and aquatic toxicity testing are required, and study plans are dependent on the results of related physical-chemical property testing results from *Tier 1*, specifically *Tier 1.1* to inform the availability of the test substance in environmental media.

There was no available TK study data by any route of exposure. Thus, *Tier 2.1* human health effects testing is a TK study via oral route of exposure in both rodent species and sexes. Results from *Tier 2.1* will inform the sensitive rodent species for performing subsequent *Tier 2.2 in vivo* toxicity testing, including rodent species selection for the TK study via the inhalation route of exposure.

The robust study summary available for the oral repeated dose toxicity study, including range finding for dose selection, may be used to inform the dose selection of the required combined repeated dose toxicity study with the reproduction/developmental toxicity screening test. There was no available study information to meet the data needs for reproductive and developmental outcomes for 6:2 FTAc.

### B. DEADLINES FOR REQUIRED TESTING PROTOCOL(S)/METHODOLOGY(IES)

For Tier 1.1 testing, as discussed in the table in **Unit III.A**, draft study plans and final study plans are due 125 and 170 days after the effective date of the Order, respectively. The final test reports for Tier 1.1 tests and all testing milestones for Tier 1.2 are provided in the table below. Following receipt of the Tier 1.1 test reports, the EPA will provide notification as to how certain parameters of Tier 1.2 testing should be conducted. Similarly, deadlines associated with draft study plans, final study plans and test reports for Tier 1.2 testing will commence upon the EPA's confirmation that the review of the Tier 1.1 test reports is completed. See the table below for more information.

Deadlines that fall on a weekend or holiday will remain and will not be extended to the next weekday.

| Test Names | Protocols/ Methodologies | Deadlines to Submit Tier 1.1 Final Test Reports Tier 1.2 Final Test Reports |
|---|---|---|
| **Required Physical/Chemical Properties** | | |
| **Tier 1.1**: Melting Point/Melting Range | OECD 102 (1995) | 365 days after effective date of the Order |
| **Tier 1.1**: Boiling Point | OECD 103 (1995) | 365 days after effective date of the Order |
| **Tier 1.1**: Vapor Pressure | OECD 104 (2006) | 365 days after effective date of the Order |
| **Tier 1.1**: Water Solubility | OECD 105 (1995) | 365 days after effective date of the Order |
| **Tier 1.1**: Hydrolysis as a Function of pH | OECD 111 (2004) | 390 days after effective date of the Order |
| **Tier 1.1**: Partition Coefficient (*n*-octanol/water), HPLC Method | OECD 117 (2022) | 365 days after effective date of the Order |
| *To pursue discussions with the EPA to combine aspects of the Tier 1.2 tests, Order recipients must initiate discussion with the EPA within 30 days of submitting the final test report for the Tier 1.1 or Tier 1.2 tests, respectively.* | | |
| **Environmental Fate and Behavior** | | |
| **Tier 1.1**: Estimation of the Adsorption Coefficient ($K_{OC}$) on Soil and on Sewage Sludge using HPLC | OECD 121 (2001) | 255 days after effective date of the Order |
| **Health Effects - Dermal Route** | | |
| **Tier 1.2**: *In Vitro* skin absorption | OECD 428 (2004) | 455 days after the EPA notification to proceed with the Tier 1.2 Testing |
| **Health Effects – Mechanistic** | | |
| **Tier 1.2**: Bacterial Reverse Mutation Test | OECD 471 (2020) | 275 days after the EPA notification to proceed with the Tier 1.2 Testing |

| Test Names | Protocols/ Methodologies | Deadlines to Submit Tier 1.1 Final Test Reports Tier 1.2 Final Test Reports |
|---|---|---|
| **Tier 1.2**: *In Vitro* Mammalian Chromosomal Aberration Test | OECD 473 (2016) | 365 days after the EPA notification to proceed with the Tier 1.2 Testing |
| **Tier 1.2**: *In Vitro* Mammalian Cell Micronucleus Test | OECD 487 (2023) | 365 days after the EPA notification to proceed with the Tier 1.2 Testing |
| **Tier 1.2**: *In Vitro* Mammalian Cell Gene Mutation Tests Using the Thymidine Kinase Gene | OECD 490 (2016) | 365 days after the EPA notification to proceed with the Tier 1.2 Testing |

| Test Names | Protocols/ Methodologies | Deadlines to Submit Tier 2.1 Final Test Reports and Tier 2.2 Study Plans and Final Test Reports |
|---|---|---|
| **Health Effects – Oral and Inhalation Routes** | | |
| **Tier 2.1**: Toxicokinetic Study (oral route) | OECD 417 (2010) | 665 days after the EPA notification to proceed with the Tier 2 Testing |
| **Tier 2.2**: Toxicokinetic Study (inhalation route) | OECD 417 (2010) | 665 days after the EPA notification to proceed with the Tier 2.2 Testing |
| **Tier 2.2**: Combined Repeated Dose Toxicity Study with the Reproduction/Developmental Toxicity Screening Test | OECD 422 (2016) | 1095 days after the EPA notification to proceed with the Tier 2.2 Testing |
| *To pursue discussions with the EPA to combine aspects of the Tier 2.2, Order recipients must initiate discussion with the EPA within 30 days of submitting the final test report for the Tier 2.1* | | |
| **Degradation and Accumulation** | | |
| **Tier 2.1**: Bioaccumulation in Fish: Aqueous and Dietary exposure | OECD 305 (2012) | 390 days after the EPA notification to proceed with the Tier 2.2 Testing |

## VI.   REQUIREMENTS OF RESPONSE OPTION 1: DEVELOP THE INFORMATION REQUIRED BY THIS ORDER

### A.   OVERVIEW

The draft study plan for Tier 1.1 testing is due to the EPA **125 days** after the effective date of this Order. The EPA will then review the draft study plan and provide input to ensure adequacy of the final study plan. For the final study plans and the final test reports, see the Deadlines for Responses, Study Plans, and Test Reports table in **Unit III.A**.

All testing described in **Unit V** must be conducted in accordance with the Good Laboratory Practice (GLP) standards in 40 Code of Federal Regulations (CFR) part 792, as specified in the CFR on the Effective Date of this Order. You must provide a statement of compliance with these GLP standards when submitting information to the EPA pursuant to this Order.

Deviations from the test guideline or specific GLP standards are allowed if the EPA ultimately approves them in the final study plan. Deviations must be submitted prior to or be included in the draft study plan. A justification is required for each deviation. Justifications should demonstrate that, despite the deviation from the given test guideline or GLP standard, that data integrity, control of bias, and study quality will be maintained with similar effectiveness. Any requested deviations and corresponding justifications must be included in the draft study plan for the EPA's consideration and, if approved, described in the test report.

Once the EPA has completed its review of the submitted test reports and accepts the information as fully complying with your testing obligations under this Order, the Agency will notify you.

### B. PRE-DRAFT STUDY PLAN CHECK-IN REQUIREMENTS

If you choose to develop the required information to comply with this Order, you must provide a Pre-Draft Study Plan Check-in to the EPA by email, in which you must identify the laboratory selected for each testing requirement. The test sponsor must submit a documented contract or agreement between test sponsor and laboratory to develop the study plan and/or conduct the testing, *e.g.*, quote, proposal, or statement of work. If such a document contains CBI, please do not submit the document via email and instead request alternate instructions to submit the CBI document to the EPA.

If the Test Sponsor believes an alternative method or deviation to the protocol(s)/methodology listed in the Order is necessary, the Pre-Draft Study Plan Check-in may also serve as an opportunity for the Test Sponsor to provide the proposed alternative (*e.g.*, to limit the number of animals used and make more efficient use of other resources or to discuss additional pilot/preliminary studies) for the EPA to comment on prior to the Draft Study Plan deliverable.

The EPA will provide by email confirmation that the Pre-Draft Study Plan Check-in is acceptable or not.

### C. DRAFT AND FINAL STUDY PLAN REQUIREMENTS

#### 1. Study Plan Requirements for All Categories of Tests

If you choose to develop the required information to comply with this Order, you must obtain and review the required protocols/methodologies. **Unit V and Appendix E** provide the protocols/methodologies that must be followed to perform each required test.

A study plan within the Test Order context refers to a document that robustly describes the testing parameters and specific details with regards to how the study will be conducted and can be easily used by another party to replicate the study with minimal additional guidance. Such a study plan will be more detailed than a test protocol because it will also address considerations for the specific test substance, testing facility, and any other conditions that are specific to the required testing such as simulating a particular condition of use that is the focus of the study.

If questions and/or issues arise during Study Plan development, the EPA encourages questions/ comments be submitted along with the Study Plan submission in accordance with the draft study plan deadline. The test sponsor must describe how to address any uncertainties that may remain. The study plan should address all required details of the protocol/methodology, including the requirements enumerated below as well as those listed in **Appendix E** for the applicable testing requirement. The draft study plan must document any uncertainties and indicate where EPA feedback is required. If the EPA's review of the draft study plan that includes questions/comments is delayed, the procedure outlined in **Unit III.B** will be followed for automatic extensions of the study plan.

In addition to requirements provided in **Appendix E** for a given test required by this Order, the Study Plans must contain the following information:

1.  This Order number, excluding the unique 6-digit company number using X's in place of the unique company number so as to protect each company's private access to the reporting module via Central Data Exchange (CDX). For example, if your Order number is TO-2020-0000-438435-00-0 then provide this number in the Study Plan: TO-2020-0000-XXXXXX-00-0.

2.  Name of test to be covered by the test protocol/methodology.

3.  The name/number of the protocol/methodology identified in this Order which you intend to follow, a copy of the identified protocol/methodology with your proposed modifications, or a copy of the alternate protocol/methodology you propose to use. Justification(s) must be provided for any deviation from the protocol/methodology identified in this Order.

4.  The identity of and supporting data on the chemical substance to be tested including physical constants, spectral and chromatographic data, chemical analysis, and stability under test and storage, and test conditions required by the protocol. A Certificate of Analysis of the test substance must be provided for each batch. This information should be submitted, if possible, in the Final Study Plan. Elements that are unavailable for the final study plan submission must be provided for review and approval prior to the commencement of testing.

5.  The sampling and analytical method that will be used. Submitted study plans without the sampling and analytical method will not be reviewed by the EPA and will not be in compliance with the study plan submission requirement.

6.  A description of the preparation and processing of samples that will be done before sampling and during sampling, including equilibration, weighing, calibration, test conditions (temperature, humidity), number and type of samples, and identification of equipment and accessories used (make, model, size/capacity, and operating conditions), including the specific sampling media and sampling instruments that will be used.

7.  A quality assurance and quality control (QA/QC) plan that will be in place prior to the commencement of testing in accordance with GLP. The study plan must indicate that the laboratory will conduct ongoing monitoring of compliance with the QA/QC plan. EPA reserves the right to require the Sponsor to provide documentation related to quality assurance and quality control related to the testing under this order.

8.  A statement indicating that any deviations from the approved study plan and/or the QA/QC procedures under GLP must be reported to EPA as soon as practicable within 72 hours from the discovery of the deviation. This is in addition to the standing requirement to document deviations in the final study report.

9.  The name(s) and address(es) of the company(ies) sponsoring the test and whether they comprise a testing consortium.

10. The name(s), mailing address(es), phone number(s), and e-mail address(es) of the appropriate individual(s) for the EPA to contact concerning the planned test.

11. The name of the testing facility and the names, mailing addresses, telephone numbers, and email addresses of the testing facility's administrative officials, study director/project managers and quality control officer responsible for ensuring the testing protocol follows appropriate quality assurance and quality control procedures.

12. Include a master schedule, which includes the start and completion dates for the study, dates that the test substances and organisms are ordered and expected to be delivered, as well as "intervals adequate to ensure the integrity of the study" at which to inspect each study. 40 CFR 792 describes what constitutes an "adequate interval". The test sponsor must provide updates to the EPA on the status of the study pursuant to such intervals. The EPA may require shorter intervals/more frequent "check-ins" if the Agency believes the study completion date could be compromised. Test sponsors may want to consider setting the delivery dates of the test substances and organisms soon after the study plan is approved by EPA if expiration of these items is a concern.

    If pilot/preliminary testing is necessary pursuant to a pre-defined (*e.g.* OECD, EPA, ISO, NIOSH, etc.) protocol, start and end dates must be provided for the pilot/preliminary testing as well as for the definitive/main study.

13. Where a pre-defined (*e.g.*, OECD, EPA, ISO, NIOSH, etc.) protocol incorporates certain preliminary testing as part of its process, the EPA requires such testing be incorporated and described in the submitted Draft Study Plan for the given testing requirement.

14. The test protocols/guidelines prescribed within this Order describe all necessary ancillary testing, any additional pilot/preliminary testing must be justified as to its need and how it will inform the definitive/main Study Plan. Thus, if it is anticipated that any additional, separate pilot/preliminary testing will be required (*e.g.*, in the event of novel testing methods), such testing must be proposed to the EPA no later than the Pre-Draft Study Plan Check-In deadline. Any request for an extension to forthcoming deadlines due to the addition of such ancillary testing must also be provided by this same milestone. A definitive study must not begin prior to receiving EPA approval of the completed pilot/preliminary study.

### 2. <u>Modifying a Required Protocol/Methodology in a Draft Study Plan</u>

The draft study plan must include the required protocols/methodologies outlined in **Unit V.A** and **Appendix E**. If you believe modifications of these required protocols/methodologies are necessary, you should propose the modification in the draft study plan and submit to the Agency with request for the Agency to consider the modifications (note that to pursue discussions with the EPA to combine aspects of the subsequent tier of tests, you must initiate discussion with the EPA within 30 days of submitting the final test report for the current tier of tests). Any consultation regarding modifications to the required protocols/methodologies will not extend the deadline for submission of the draft study plan.

Any submitted requests for modifications of the required protocols/methodologies must include a detailed description of the proposed modification as well as a detailed description of the justification and reasoning for such modifications. Requests for modifications of protocol/methodology or the use of an alternate protocol/methodology must discuss why such changes are appropriate and whether they could alter the validity of the study. The rationales do not have to be listed in a separate document in the study plan if they are included and clearly identified in the relevant section of the study plan describing the protocols/methodologies.

If the EPA has concerns about the requested protocol/methodology or your requested modifications of the required protocol/methodology, the Agency will inform you of concerns that must be addressed before the EPA will approve your study plan. The EPA has 15 days from the deadline for the study plan to respond. For each day following this period that the EPA does not respond, the EPA will extend the deadline for the final study plan by one day (see **Unit III**).

### 3. <u>The EPA Review of Study Plans and Final Test Reports</u>

The EPA will not conduct a substantive review of any draft study plan that does not meet the requirements as provided in **Unit VI.C** and **Appendix E**. Such a submission does not constitute meeting the deadline for the draft study plan submission. **Unit III** provides information on deadlines and the EPA response timelines.

Submitting a draft study plan, final study plan, and final test report which do not fully comply with the terms of this Order and by the deadlines provided in **Unit III** may result in a violation of TSCA section 15.

#### a. *Study Plans*

Following review of a draft study plan submission, the EPA will indicate what modifications, if any, are required and must be incorporated into the final study plan. Accompanying a proposed final study plan submission, the submitter must provide a clean and red-lined version. The red-lined version will indicate the changes incorporated into the final study plan as compared with the prior study plan submission.

If the EPA requires modifications to a submitted draft study plan, the Agency may elect to provide a line-by-line list of comments that must be addressed and corrected before the final study plan will be approved. If the submitter receives a line-by-line list of comments, the submitter must address each individual comment and include this in their response to the Agency along with the proposed final study plan.

Prior to initiating any test, the Company/Consortium must first address the EPA's input on the study plan and receive the EPA's acceptance of the final study plan.

The EPA's acceptance of a final study plan does not constitute pre-acceptance of any future test results. If testing conducted according to a requested protocol/methodology or requested

modifications of the required protocol/methodology is initiated prior to EPA approval, that testing will not satisfy the requirements of the Company under this Order.

If, after the final study plan has been approved or after testing is underway, you wish to make a modification to an identified protocol/methodology or use a different protocol/methodology, you must submit a request to the EPA to make these changes in your study and you must still meet the deadlines set out in **Unit V** and **Appendix E** for the relevant test or request an extension (see **Unit III.C**), if needed.

Following the approval of a final study plan, the EPA requires that the company/consortium provide email updates on the status of the associated testing pursuant to check-in intervals as provided in the study plan. These updates must be provided to both the EPA Order manager as well as tscatestorders@epa.gov. Further, should any deviation(s) arise that may prevent submission of the final test report by the applicable deadline, the company/consortium must notify the EPA immediately. See **Unit VI.B** for check-in requirements.

Note that submitting questions to the EPA regarding study plan requirements will not extend the deadline for a study plan submission.

> *b. Final Test Reports*

During EPA's review of the final test report, data quality is evaluated on an outcome-by-outcome basis (*e.g.*, Health Outcome) in accordance with the draft TSCA Systematic Review Protocol 4(h)(1)(A), 26(k). Once the EPA has completed its initial review and accepted data for all test reports subject to this Order for a given testing requirement, the EPA will notify the designated contact for the company subject to this Order and any designated consortium that this testing requirement has been satisfied, which in turn will close out the testing requirement of this Order for the companies and participants in any consortium subject to this Order. Failure to file a final test report meeting all the requirements in this Order by the deadline in **Unit III** is a violation of TSCA. Your final test report must be submitted along with the data in the associated OECD harmonized template format, if available. OECD harmonized templates can be located at the OECD Harmonized Templates webpage (OECD, 2018b):

a. *Melting Point/Melting Range OECD 102 (1995)* (OECD, 1995b)

   • *Harmonized Template Identifier: OHT 2 (Melting point/freezing point)*

b. *Boiling Point OECD 103 (1995)* (OECD, 1995c)

   • *Harmonized Template Identifier: OHT 3 (Boiling point)*

c. *Vapor Pressure OECD 104 (2006)* (OECD, 2006)

   • *Harmonized Template Identifier: OHT 7 (Vapor pressure)*

d. *Water Solubility OECD 105 (1995)* (OECD, 1995a)

- *Harmonized Template Identifier: OHT 9 (Water solubility)*

e. *Hydrolysis as a Function of pH OECD 111 (2004)* ([OECD, 2004a](#))

- *Harmonized Template Identifier: OHT 25 (Hydrolysis)*

f. *n-octanol/water Partition Coefficient HPLC Method, or $K_{OW}$ OECD 117 (2022)* ([OECD, 2022](#))

- *Harmonized Template Identifier: OHT 7 (Partition Coefficient)*

g. *Estimation of the Adsorption Coefficient, or $K_{OC}$, on Soil and on Sewage Sludge using High Performance Liquid Chromatography (HPLC) OECD 121 (2001)* ([OECD, 2001](#))

- *Harmonized Template Identifier: OHT 34 (Adsorption/Desorption)*

h. *Bioaccumulation in Fish: Aqueous and Dietary Exposure OECD 305 (2012)* ([OECD, 2012](#))

- *Harmonized Template Identifier: OHT 32 (Bioaccumulation: aquatic/sediment)*

i. *Skin Absorption: In Vitro Method (OECD 428 (2004))* ([OECD, 2004b](#))

- *Harmonized Template Identifier: OHT 59 (Dermal absorption)*

j. *Genotoxicity tests (dependent on hydrolysis half-life)*

- *Bacterial Reverse Mutation Test OECD 471 (2020)* ([OECD, 2020](#))
- *In Vitro Mammalian Chromosomal Aberration Test OECD 473 (2016)* ([OECD, 2016b](#))
- *In Vitro Mammalian Cell Gene Mutation Tests Using the Thymidine Kinase Gene OECD 490 (2016)* ([OECD, 2016c](#))
- *In Vitro Mammalian Cell Micronucleus Test OECD 487 (2023)* ([OECD, 2023](#))
  - *Harmonized Template Identifier: OHT 70 (Genetic toxicity in vitro)*

k. *Toxicokinetics (OECD 417 (2010))* ([OECD, 2010](#)), *oral route*

- *Harmonized Template Identifier: OHT 58 (Basic toxicokinetics)*

l. *Toxicokinetics (OECD 417 (2010))* ([OECD, 2010](#)), *inhalation route*

- *Harmonized Template Identifier: OHT 58 (Basic toxicokinetics)*

m. *TK-derived half-life < 7 days: Combined Repeated Dose Toxicity Study with the Reproduction/Developmental Toxicity Screening Test OECD 422 (2016)* ([OECD, 2016a](#)), *oral route*

- *Harmonized Template Identifier: OHT 67 (Repeated dose toxicity: oral) and OHT 73 (Repeated dose toxicity: oral)*

**If the TK-derived half-life is greater than or equal to 7 days**, the OECD 422 via oral route, study may require modifications under Agency advisement. Anticipated modifications may include extending the pre-mating exposure period. Extending the pre-mating exposure period may better compensate for the longer half-life of the test substance and achieve steady state of the test substance before mating occurs, in order to observe potential exposure-related reproductive and developmental effects. Functional observation battery must be performed in at least 5 animals/sex/dose, as applicable and as described in OECD 424 (OECD, 1997).

## VII.    FEES FOR SUBMITTING INFORMATION

Per 40 CFR § 700.45, and taking into account the inflation adjustment that went into effect on January 1, 2022, the Test Order fee is $11,650 to be split evenly among the manufacturers who are required to test a chemical substance or mixture subject to the Test Order (accounting for small business considerations). Processors are not subject to this fee, nor are manufacturers who submit existing information or receive an exemption in compliance with this Order.

Small businesses may be subject to no more than 20% of the amount of the applicable fee. A company may qualify for a "small business concern" discount if their total number of employees is at or below the maximum allowed in the final rule for that company's North American Industry Classification System (NAICS) code (see 40 CFR 700.43). In order for an entity to qualify as a "small business concern," its number of employees shall not exceed the size standard for the applicable industry. When calculating the number of employees, the company must include the employees of all parent and subsidiary companies within the corporate chain. Please note that small business fees are only applicable to qualifying small businesses who are either not associated with a consortium or associated with an all-small business consortium. See the TSCA User Fees webpage (USEPA, 2021c) for more information.

A company can identify itself as a small business when responding to this Order via the CDX application. The "small business concern" discount will be included in the determination of company-specific invoices for the distribution of the $11,650 fee across all manufacturers conducting testing for the given Test Order. Where a consortium is responsible for the fee for its members for purposes of this Order, and at least one of the members is not a small business, the EPA does not apply a "small business concern" discount to the portion of the $11,650 distributed to the consortium.

Fees for Test Orders under TSCA section 4 will be invoiced electronically by the EPA. Invoice notices will be populated into the specific user's "Copy of Record" screen in CDX and will contain a button that will initiate the payment process. When an invoice is generated, notification e-mails will be sent to the user's CDX inbox and the e-mail address associated with the relevant CDX account. Payment information will be collected in CDX and then submitted to Pay.gov for processing.

Note that there are many fees associated with TSCA-related activities. See the TSCA Fees table webpage (USEPA, 2021d) for more information. The TSCA section 4 Test Order fee is separate from these fees. A company's inclusion in or exclusion from other TSCA fees is unrelated to that company's status with regards to TSCA section 4 Test Order fees.

Pursuant to 40 CFR § 700.45, the applicable fee shall be paid in full no later than 120 days after the effective date of the Order. Should the EPA invoice the fee more than 90 days after the effective date of the Order, payment will be due within 30 days of such invoicing.

## VIII.  INSTRUCTIONS IF YOU CHOOSE TO PARTICIPATE IN A CONSORTIUM

If you choose to form or join a consortium to share in the cost of developing the required information, you (as well as the other Order recipients who are participants in the consortium) must, individually in the CDX portal, state your intention to participate in a testing consortium for each specific chemical and specific test. Consortium participants must individually respond in the CDX portal with their intent to participate before designated leads are able to add them to the consortium.

In addition, the designated lead for the consortium must submit a consortium response to the EPA in the CDX portal. The response must confirm the formation of the consortium, identify its member companies, and list the testing obligations that the consortium plans to fulfill on behalf of each company by indicating each specific test. The response must also include contact information for the designated lead of the consortium, who must be domiciled in the United States. The designated lead for the consortium must submit the response and required information on behalf of the consortium and its member companies by the deadlines listed in **Unit III.A**. Submissions made on behalf of the consortium must be in accordance with instructions in **Appendix C**. Note that a consortium lead need not be a recipient of an Order; other entities (such as trade organizations) may act as a lead and submit the information required under this Order. After the results of the last required test of this Order are submitted and the EPA accepts the information as complying with this Order, or the EPA accepts existing information submitted by the Consortium, the EPA will provide notification of compliance with this Order to this Order's recipients and the designated lead of the consortium.

Even if you agree to jointly submit the information as part of a consortium, each Order Recipient is still required to comply with this Order (with the study plan and results being submitted by the consortium) and is individually liable in the event of any failure to comply with this Order. If the consortium fails to submit the information or meet any of the requirements of this Order on the recipient's behalf, the recipient will be in violation of this Order unless the recipient submits the required information or meets the requirement individually.

The Agency has provided a list of the manufacturers and processors that have received this Order at the top of this Order in the Summary Information section. This list of manufacturers and processors can be used to help Order Recipients form a consortium to jointly develop information, consolidate testing and share the cost of testing. Information on cost sharing is provided in **Appendix B**.

## IX.   CONFIDENTIALITY

Under TSCA section 14(b)(2), health and safety studies submitted under TSCA and data reported to or otherwise obtained by the Administrator from health and safety studies are not protected from disclosure if the studies and data concern a chemical that is offered for commercial distribution, or for which testing is required under TSCA section 4 or notification is required under TSCA section 5. However, TSCA section 14(b)(2) does not apply to information that discloses processes used in the

manufacturing or processing of a chemical substance or mixture or, in the case of a mixture, the portion of the mixture comprised of the chemical subject to this Order. Therefore, some or all of the information in the studies required to be submitted under this Order might not be eligible for TSCA confidential business information (CBI) protections.

Information submitted under TSCA that you wish to have the EPA protect as confidential business information (CBI) must be clearly identified as such when submitted. For sections of the report that are claimed as CBI, the report must be accompanied by a sanitized version of the report only removing the specific information claimed as CBI. A sanitized test report that redacts all or most of the study may be rejected by the EPA as not satisfying the requirements of this Order.

When claiming information as CBI, you must certify to the following:

*"I hereby certify to the best of my knowledge and belief that all information entered on this form is complete and accurate.*

*I further certify that, pursuant to 15 U.S.C. § 2613(c), for all claims for confidentiality made with this submission, all information submitted to substantiate such claims is true and correct, and that it is true and correct that*

*(i)   My company has taken reasonable measures to protect the confidentiality of the information;*
*(ii)  I have determined that the information is not required to be disclosed or otherwise made available to the public under any other Federal law;*
*(iii) I have a reasonable basis to conclude that disclosure of the information is likely to cause substantial harm to the competitive position of my company; and*
*(iv)  I have a reasonable basis to believe that the information is not readily discoverable through reverse engineering.*

*Any knowing and willful misrepresentation is subject to criminal penalty pursuant to 18 U.S.C. § 1001."*

In addition, information claimed as CBI must be substantiated upon submission, with the exception of information described in TSCA Section 14(c)(2). See guidance for substantiating CBI claims (USEPA, 2021e). The procedures for assertion and substantiation of CBI claims can be found at 40 CFR 703.

When a claim of CBI is asserted for certain information under TSCA section 14, the Administrator will generally protect that information from disclosure for 10 years (*e.g.*, unless the protection from disclosure is withdrawn by the person that asserted the claim), whereupon the claim must be reasserted and re-substantiated if the submitter wishes to maintain the CBI claim. In certain cases, the EPA may review claims prior to the expiration of the 10-year period.

Under circumstances stated in TSCA section 14(d), the EPA may disclose information claimed as CBI to other persons including, for example, Federal and State authorities, health and environmental professionals, poison control centers, and emergency responders.

## X.    CONSEQUENCES OF FAILURE TO COMPLY WITH THIS ORDER

Failure to comply with any of the requirements in this Order is a violation of TSCA section 15 and could subject you to civil and/or criminal penalties under TSCA section 16, 15 U.S.C. § 2615 as modified by the Federal Civil Penalties Inflation Adjustment Act. Each day that failure to meet the requirements continues constitutes a separate violation.

## XI.    REFERENCES

The following is a listing of the documents that are generally applicable to this Order. Please note that references, guidance, and information from additional sources could be considered, with EPA approval, during the development of study plans.

ATSDR. (2021). Toxicological profile for perfluoroalkyls [ATSDR Tox Profile]. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service. http://dx.doi.org/10.15620/cdc:59198

Brase, RA; Schwab, HE; Li, L; Spink, DC. (2022). Elevated levels of per- and polyfluoroalkyl substances (PFAS) in freshwater benthic macroinvertebrates from the Hudson River Watershed. Chemosphere 291: 132830. http://dx.doi.org/10.1016/j.chemosphere.2021.132830

Chen, C; Wang, J; Li, L; Xu, W; Liu, J. (2020). Comparison of fluorotelomer alcohol emissions from wastewater treatment plants into atmospheric and aquatic environments. Environ Int 139: 105718. http://dx.doi.org/10.1016/j.envint.2020.105718

Chen, H; Peng, H; Yang, M; Hu, J; Zhang, Y. (2017). Detection, occurrence and fate of fluorotelomer alcohols in municipal wastewater treatment plants. Environ Sci Technol 51: 8953-8961. http://dx.doi.org/10.1021/acs.est.7b00315

Chen, Q; Yi, S; Ye, Q; Zhu, Y; Zhong, W; Zhu, L. (2022). Insights into the Dermal Absorption, Deposition, and Elimination of Poly- and Perfluoroalkyl Substances in Rats: The Importance of Skin Exposure. Environ Sci Technol 56: 16975-16984. http://dx.doi.org/10.1021/acs.est.2c03181

Dauchy, X; Boiteux, V; Bach, C; Colin, A; Hemard, J; Rosin, C; Munoz, JF. (2017). Mass flows and fate of per- and polyfluoroalkyl substances (PFASs) in the wastewater treatment plant of a fluorochemical manufacturing facility. Sci Total Environ 576: 549-558. http://dx.doi.org/10.1016/j.scitotenv.2016.10.130

Dawson, DE; Lau, C; Prachi, P; Sayre, RR; Judson, RS; Tornero-Velez, R; Wambaugh, JF; Wambaugh, JF. (2023). A machine learning model to estimate toxicokinetic half-lives of per- and polyfluoro-alkyl substances (PFAS) in multiple species. Toxics 11: 98. http://dx.doi.org/10.3390/toxics11020098

Del Vento, S; Halsall, C; Gioia, R; Jones, K; Dachs, J. (2012). Volatile per- and polyfluoroalkyl compounds in the remote atmosphere of the western Antarctic Peninsula: an indirect source of perfluoroalkyl acids to Antarctic waters? Atmos Pollut Res 3: 450-455. http://dx.doi.org/10.5094/APR.2012.051

Dreyer, A; Ebinghaus, R. (2009). Polyfluorinated compounds in ambient air from ship- and land-based measurements in northern Germany. Atmos Environ 43: 1527-1535. http://dx.doi.org/10.1016/j.atmosenv.2008.11.047

EC. (2006). Regulation (EC) 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH), establishing a European Chemicals Agency, amending Directive 1999/45/EC and

repealing Council Regulation (EEC) 793/93 and Commission Regulation (EC) No 1488/94 as well as Council Directive 76/769/EEC and Commission Directives 91/155/EEC, 93/67/EEC, 93/105/EC and 2000/21/EC. https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX%3A32006R1907

ECETOC. (2009). Evaluation of cardiac sensitisation test methods, Technical report No. 105. Brussels, Belgium. https://www.ecetoc.org/wp-content/uploads/2021/10/ECETOC-TR-105.pdf

ECHA. (2015). Committee for risk assessment (RAC) committee for socio-economic analysis (SEAC) background document to the opinion on the Annex XV dossier proposing restrictions on perfluorooctanoic acid (PFOA), PFOA salts and PFOA-related substances. (ECHA/RAC/RES-O-0000006229-70-02/F; ECHA/SEAC/RES-O-0000006229-70-03/F). Helsinki, Finland. https://echa.europa.eu/documents/10162/13641/rest_pfoa_final_bd_en.pdf/61e81035-e0c5-44f5-94c5-2f53554255a8

Evich, MG; Davis, MJB; McCord, JP; Acrey, B; Awkerman, JA; Knappe, DRU; Lindstrom, AB; Speth, TF; Tebes-Stevens, C; Strynar, MJ; Wang, Z; Weber, EJ; Henderson, WM; Washington, JW. (2022). Per- and polyfluoroalkyl substances in the environment [Review]. Science 375: eabg9065. http://dx.doi.org/10.1126/science.abg9065

Fenton, SE; Ducatman, A; Boobis, A; DeWitt, JC; Lau, C; Ng, C; Smith, JS; Roberts, SM. (2021). Per- and polyfluoroalkyl substance toxicity and human health review: Current state of knowledge and strategies for informing future research [Review]. Environ Toxicol Chem 40: 606-630. http://dx.doi.org/10.1002/etc.4890

Fromme, H; Dreyer, A; Dietrich, S; Fembacher, L; Lahrz, T; Voelkel, W. (2015). Neutral polyfluorinated compounds in indoor air in Germany - The LUPE 4 study. Chemosphere 139: 572-578. http://dx.doi.org/10.1016/j.chemosphere.2015.07.024

George, SE; Baker, TR; Baker, BB. (2023). Nonlethal detection of PFAS bioaccumulation and biomagnification within fishes in an urban- and wastewater-dominant Great Lakes watershed. Environ Pollut 121123. http://dx.doi.org/10.1016/j.envpol.2023.121123

IOMCED. (2022). Series on Testing & Assessment, No. 156: Guidance notes on dermal absorption studies (Second edition). (ENV/JM/MONO(2011)36/REV1). Paris, France: Organisation for Economic Co-operation and Development (OECD). https://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=ENV-JM-MONO(2011)36%20&doclanguage=en

Judson, R. (2018). ToxValDB: Compiling publicly available in vivo toxicity data [Presentation]. In EPA's Computational Toxicology Communities of Practice Monthly Meeting. Retrieved from https://doi.org/10.23645/epacomptox.7800653

Just, H; Göckener, B; Lämmer, R; Wiedemann-Krantz, L; Stahl, T; Breuer, J; Gassmann, M; Weidemann, E; Bücking, M; Kowalczyk, J. (2022). Degradation and Plant Transfer Rates of Seven Fluorotelomer Precursors to Perfluoroalkyl Acids and F-53B in a Soil-Plant System with Maize (Zea mays L.). J Agric Food Chem 70: 8920-8930. http://dx.doi.org/10.1021/acs.jafc.1c06838

Kissel, JC; Titaley, IA; Muensterman, DJ; Field, JA. (2023). Evaluating neutral PFAS for potential dermal absorption from the gas phase. Environ Sci Technol 57: 4951-4958. http://dx.doi.org/10.1021/acs.est.2c08835

Kurwadkar, S; Dane, J; Kanel, SR; Nadagouda, MN; Cawdrey, RW; Ambade, B; Struckhoff, GC; Wilkin, R. (2022). Per- and polyfluoroalkyl substances in water and wastewater: A critical review of their global occurrence and distribution [Review]. Sci Total Environ 809: 151003. http://dx.doi.org/10.1016/j.scitotenv.2021.151003

Lai, S; Song, J; Song, T; Huang, Z; Zhang, Y; Zhao, Y; Liu, G; Zheng, J; Mi, W; Tang, J; Zou, S; Ebinghaus, R; Xie, Z. (2016). Neutral polyfluoroalkyl substances in the atmosphere over the northern South China Sea. Environ Pollut 214: 449-455. http://dx.doi.org/10.1016/j.envpol.2016.04.047

Langer, V; Dreyer, A; Ebinghaus, R. (2010). Polyfluorinated compounds in residential and nonresidential indoor air. Environ Sci Technol 44: 8075-8081. http://dx.doi.org/10.1021/es102384z

Lin, H; Lao, JY; Wang, Q; Ruan, Y; He, Y; Lee, PKH; Leung, KMY; Lam, PKS. (2022). Per- and polyfluoroalkyl substances in the atmosphere of waste management infrastructures: Uncovering secondary fluorotelomer alcohols, particle size distribution, and human inhalation exposure. Environ Int 167: 107434. http://dx.doi.org/10.1016/j.envint.2022.107434

Liu, J; Wang, N; Buck, RC; Wolstenholme, BW; Folsom, PW; Sulecki, LM; Bellin, CA. (2010a). Aerobic biodegradation of [14C] 6:2 fluorotelomer alcohol in a flow-through soil incubation system. Chemosphere 80: 716-723. http://dx.doi.org/10.1016/j.chemosphere.2010.05.027

Liu, J; Wang, N; Szostek, B; Buck, RC; Panciroli, PK; Folsom, PW; Sulecki, LM; Bellin, CA. (2010b). 6-2 Fluorotelomer alcohol aerobic biodegradation in soil and mixed bacterial culture. Chemosphere 78: 437-444. http://dx.doi.org/10.1016/j.chemosphere.2009.10.044

Miranda, DA; Peaslee, GF; Zachritz, AM; Lamberti, GA. (2022). A worldwide evaluation of trophic magnification of per- and polyfluoroalkyl substances in aquatic ecosystems [Review]. Integr Environ Assess Manag 18: 1500-1512. http://dx.doi.org/10.1002/ieam.4579

Munoz, G; Mercier, L; Duy, SV; Liu, J; Sauvé, S; Houde, M. (2022). Bioaccumulation and trophic magnification of emerging and legacy per- and polyfluoroalkyl substances (PFAS) in a St. Lawrence River food web. Environ Pollut 309: 119739. http://dx.doi.org/10.1016/j.envpol.2022.119739

NLM. (2022). PubChem: Hexafluoropropylene oxide (CAS No. 428-59-1) [Website]. https://pubchem.ncbi.nlm.nih.gov/compound/Hexafluoropropylene-oxide

OECD. (1995a). OECD Guidelines for testing of chemicals, section 1: Test No. 105: water solubility. https://www.oecd-ilibrary.org/environment/test-no-105-water-solubility_9789264069589-en

OECD. (1995b). Test No. 102: Melting point/Melting range. Paris, France. http://dx.doi.org/10.1787/9789264069527-en

OECD. (1995c). Test No. 103: Boiling point. Paris, France. http://dx.doi.org/10.1787/9789264069541-en

OECD. (1997). Test no. 424: Neurotoxicity study in rodents. Paris, France. http://dx.doi.org/10.1787/9789264071025-en

OECD. (2001). Test No. 121: Estimation of the adsorption coefficient (Koc ) on soil and on sewage sludge using High Performance Liquid Chromatography (HPLC). Paris, France. http://dx.doi.org/10.1787/9789264069909-en

OECD. (2004a). Test No. 111: Hydrolysis as a function of pH. Paris, France. http://dx.doi.org/10.1787/9789264069701-en

OECD. (2004b). Test No. 428: Skin absorption: In vitro method. Paris, France. http://dx.doi.org/10.1787/9789264071087-en

OECD. (2006). Test No. 104: Vapour pressure. Paris, France. http://dx.doi.org/10.1787/9789264069565-en

OECD. (2010). Test No. 417: Toxicokinetics. Paris, France: OECD Publishing. http://dx.doi.org/10.1787/9789264070882-en.

OECD. (2012). Test No. 305: Bioaccumulation in fish: Aqueous and dietary exposure. In 9789264185296. Paris, France: OECD Publishing. http://dx.doi.org/10.1787/9789264185296-en

OECD. (2016a). OECD guidelines for the testing of chemicals, Section 4: Health effects Test no. 422: Combined repeated dose toxicity study with the reproduction/developmental toxicity screening test: 2016 version. Paris, France. http://dx.doi.org/10.1787/9789264264403-en

OECD. (2016b). Test No. 473: In vitro mammalian chromosomal aberration test. Paris, France. http://dx.doi.org/10.1787/9789264264649-en

OECD. (2016c). Test No. 490: In vitro mammalian cell gene mutation tests using the thymidine kinase gene. Paris, France. http://dx.doi.org/10.1787/9789264264908-en

OECD. (2018a). OECD guidelines for the testing of chemicals. https://www.oecd-ilibrary.org/environment/oecd-guidelines-for-the-testing-of-chemicals_72d77764-en

OECD. (2018b). OECD harmonised templates. https://www.oecd.org/ehs/templates/harmonised-templates.htm.

OECD. (2020). Test No. 471: Bacterial reverse mutation test. Paris, France. http://dx.doi.org/10.1787/9789264071247-en

OECD. (2022). Test No. 117: Partition coefficient (n-octanol/water), HPLC method. Paris, France. http://dx.doi.org/10.1787/9789264069824-en

OECD. (2023). Test No. 487: In vitro mammalian cell micronucleus test. Paris, France. https://www.oecd-ilibrary.org/environment/test-no-487-in-vitro-mammalian-cell-micronucleus-test_9789264264861-en

Pickard, HM; Ruyle, BJ; Thackray, CP; Chovancova, A; Dassuncao, C; Becanova, J; Vojta, S; Lohmann, R; Sunderland, EM. (2022). PFAS and Precursor Bioaccumulation in Freshwater Recreational Fish: Implications for Fish Advisories. Environ Sci Technol. http://dx.doi.org/10.1021/acs.est.2c03734

Ragnarsdóttir, O; Abdallah, MA; Harrad, S. (2022). Dermal uptake: An important pathway of human exposure to perfluoroalkyl substances? [Review]. Environ Pollut 307: 119478. http://dx.doi.org/10.1016/j.envpol.2022.119478

Royer, LA; Lee, LS; Russell, MH; Nies, LF; Turco, RF. (2015). Microbial transformation of 8:2 fluorotelomer acrylate and methacrylate in aerobic soils. Chemosphere 129: 54-61. http://dx.doi.org/10.1016/j.chemosphere.2014.09.077

Schwartz-Narbonne, H; Xia, C; Shalin, A; Whitehead, HD; Yang, D; Peaslee, GF; Wang, Z; Wu, Y; Peng, H; Blum, A; Venier, M; Diamond, ML. (2023). Per- and polyfluoroalkyl substances in Canadian fast food packaging. Environ Sci Technol Lett 10: 343–349. http://dx.doi.org/10.1021/acs.estlett.2c00926

Sims, JL; Stroski, KM; Kim, S; Killeen, G; Ehalt, R; Simcik, MF; Brooks, BW. (2021). Global occurrence and probabilistic environmental health hazard assessment of per- and polyfluoroalkyl substances (PFASs) in groundwater and surface waters [Review]. Sci Total Environ 816: 151535. http://dx.doi.org/10.1016/j.scitotenv.2021.151535

Sosnowska, A; Bulawska, N; Kowalska, D; Puzyn, T. (2023). Towards higher scientific validity and regulatory acceptance of predictive models for PFAS. Green Chem 25: 1261-1275. http://dx.doi.org/10.1039/D2GC04341F

Su, A; Rajan, K. (2021). A database framework for rapid screening of structure-function relationships in PFAS chemistry. Scientific Data 8: 14. http://dx.doi.org/10.1038/s41597-021-00798-x

Titaley, IA; De la Cruz, FB; Barlaz, MA; Field, JA. (2023). Neutral per- and polyfluoroalkyl substances in in situ landfill gas by thermal desorption–gas chromatography–mass spectrometry. Environ Sci Technol Lett 10: 214–221. http://dx.doi.org/10.1021/acs.estlett.3c00037

USEPA. (1996). Product properties test guidelines: OPPTS 830.7220: Boiling point/boiling range [EPA Report]. (EPA 712–C–96–034; EPA-HQ-OPPT-2009-0151-0027). Washington, DC: U.S.

Environmental Protection Agency, Office of Prevention, Pesticides and Toxic Substances. https://www.regulations.gov/document/EPA-HQ-OPPT-2009-0151-0027

USEPA. (1998). Product properties test guidelines: OPPTS 830.7200: Melting point/melting range [EPA Report]. (EPA 712–C–98–033; EPA-HQ-OPPT-2009-0151-0026). Washington, DC: U.S. Environmental Protection Agency, Office of Prevention, Pesticides and Toxic Substances. https://www.regulations.gov/document/EPA-HQ-OPPT-2009-0151-0026

USEPA. (2011). Exposure factors handbook: 2011 edition [EPA Report]. (EPA/600/R-090/052F). Washington, DC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment. https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100F2OS.txt

USEPA. (2012). Sustainable Futures / P2 Framework Manual, Section 12: Estimating general population and aquatic exposure using E-FAST. (EPA-748-B12-001). Washington, DC: U.S. Environmental Protection Agency, OCSPP. https://www.epa.gov/sustainable-futures/sustainable-futures-p2-framework-manual

USEPA. (2015). Test guidelines for pesticides and toxic substances. https://www.epa.gov/test-guidelines-pesticides-and-toxic-substances

USEPA. (2016a). Health effects support document for perfluorooctane sulfonate (PFOS) [EPA Report]. (EPA 822-R-16-002). Washington, DC: U.S. Environmental Protection Agency, Office of Water, Health and Ecological Criteria Division. https://www.epa.gov/sites/production/files/2016-05/documents/pfos_hesd_final_508.pdf

USEPA. (2016b). Health effects support document for perfluorooctanoic acid (PFOA) [EPA Report]. (EPA 822-R-16-003). Washington, DC: U.S. Environmental Protection Agency, Office of Water, Health and Ecological Criteria Division. https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_hesd_final-plain.pdf

USEPA. (2021a). National PFAS Testing Strategy: Identification of candidate per- and polyfluoroalkyl substances (PFAS) for testing. Washington, DC. https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/national-pfas-testing-strategy

USEPA. (2021c). TSCA fees and small businesses. https://www.epa.gov/tsca-fees/tsca-fees-and-small-businesses

USEPA. (2021d). TSCA fees table. https://www.epa.gov/tsca-fees/tsca-fees-table

USEPA. (2021e). What to include in CBI substantiations. https://www.epa.gov/tsca-cbi/what-include-cbi-substantiations

USEPA. (2022a). Our current understanding of the human health and environmental risks of PFAS [Website]. https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas

USEPA. (2022b). PFAS explained [Website]. https://www.epa.gov/pfas/pfas-explained

van der Veen, I; Schellenberger, S; Hanning, AC; Stare, A; de Boer, J; Weiss, JM; Leonards, PEG. (2022). Fate of Per- and Polyfluoroalkyl Substances from Durable Water-Repellent Clothing during Use. Environ Sci Technol 56: 5886-5897. http://dx.doi.org/10.1021/acs.est.1c07876

Weinberg, I; Dreyer, A; Ebinghaus, R. (2011). Landfills as sources of polyfluorinated compounds, polybrominated diphenyl ethers and musk fragrances to ambient air. Atmos Environ 45: 935-941. http://dx.doi.org/10.1016/j.atmosenv.2010.11.011

Whitehead, HD; Venier, M; Wu, Y; Eastman, E; Urbanik, S; Diamond, ML; Shalin, A; Schwartz-Narbonne, H; Bruton, TA; Blum, A; Wang, Z; Green, M; Tighe, M; Wilkinson, JT; McGuinness, S; Peaslee, GF. (2021). Fluorinated compounds in North American cosmetics. Environ Sci Technol Lett 8: 538–544. http://dx.doi.org/10.1021/acs.estlett.1c00240

Winkens, K; Koponen, J; Schuster, J; Shoeib, M; Vestergren, R; Berger, U; Karvonen, AM; Pekkanen, J; Kiviranta, H; Cousins, IT. (2017). Perfluoroalkyl acids and their precursors in indoor air sampled in children's bedrooms. Environ Pollut 222: 423-432. http://dx.doi.org/10.1016/j.envpol.2016.12.010

Wu, Y; Miller, GZ; Gearhart, J; Peaslee, G; Venier, M. (2021). Side-chain fluorotelomer-based polymers in children car seats. Environ Pollut 268: 115477. http://dx.doi.org/10.1016/j.envpol.2020.115477

Xia, C; Diamond, ML; Peaslee, GF; Peng, H; Blum, A; Wang, Z; Shalin, A; Whitehead, HD; Green, M; Schwartz-Narbonne, H; Yang, D; Venier, M. (2022). Per- and Polyfluoroalkyl Substances in North American School Uniforms. Environ Sci Technol 56: 13845-13857. http://dx.doi.org/10.1021/acs.est.2c02111

Xie, Z; Zhao, Z; Möller, A; Wolschke, H; Ahrens, L; Sturm, R; Ebinghaus, R. (2013). Neutral poly- and perfluoroalkyl substances in air and seawater of the North Sea. Environ Sci Pollut Res Int 20: 7988-8000. http://dx.doi.org/10.1007/s11356-013-1757-z

Ye, B; Wang, J; Zhou, L; Yu, X; Qian, S. (2024). Perfluoroalkyl acid precursors in agricultural soil-plant systems: Occurrence, uptake, and biotransformation. Sci Total Environ 912: 168974. http://dx.doi.org/10.1016/j.scitotenv.2023.168974

Young, CJ; Mabury, SA. (2010). Atmospheric perfluorinated acid precursors: chemistry, occurrence, and impacts [Review]. Rev Environ Contam Toxicol 208: 1-109. http://dx.doi.org/10.1007/978-1-4419-6880-7_1

Zhang, S; Szostek, B; McCausland, PK; Wolstenholme, BW; Lu, X; Wang, N; Buck, RC. (2013). 6:2 and 8:2 fluorotelomer alcohol anaerobic biotransformation in digester sludge from a WWTP under methanogenic conditions. Environ Sci Technol 47: 4227-4235. http://dx.doi.org/10.1021/es4000824

Zhao, L; Folsom, PW; Wolstenholme, BW; Sun, H; Wang, N; Buck, RC. (2013a). 6:2 fluorotelomer alcohol biotransformation in an aerobic river sediment system. Chemosphere 90: 203-209. http://dx.doi.org/10.1016/j.chemosphere.2012.06.035

Zhao, L; McCausland, PK; Folsom, PW; Wolstenholme, BW; Sun, H; Wang, N; Buck, RC. (2013b). 6:2 Fluorotelomer alcohol aerobic biotransformation in activated sludge from two domestic wastewater treatment plants. Chemosphere 92: 464-470. http://dx.doi.org/10.1016/j.chemosphere.2013.02.032

## XII.   PAPERWORK REDUCTION ACT NOTICE

This collection of information is approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq*. (OMB Control No. 2070-0033). Responses to this collection of information are mandatory under the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq*. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The public reporting and recordkeeping burden for this collection of information is estimated to be 137 hours for the average response on a per-chemical basis. Under the PRA, burden is defined at 5 CFR 1320.3(b). Send comments on the Agency's need for this information, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to the Information Engagement Division Director, U.S. Environmental Protection Agency (2821T), 1200 Pennsylvania Ave., NW,

Washington, D.C. 20460. Include the OMB control number in any correspondence. Do not send the completed form to this address.

## XIII.   FOR FURTHER INFORMATION CONTACT

*For technical information contact*: TSCATestOrders@epa.gov.

*For general information contact*: The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554-1404; email address: TSCA-Hotline@epa.gov.

## XIV.   SIGNATURE

Under the authority in TSCA Section 4(a)(1), the United States Environmental Protection Agency hereby issues this Order to take effect five days after the date of my signature.

**Michal Freedhoff,**

*Assistant Administrator, Office of Chemical Safety and Pollution Prevention.*

Sincerely,

MICHAL FREEDHOFF

Digitally signed by MICHAL FREEDHOFF
Date: 2024.10.08 13:46:53 -04'00'

Michal Freedhoff

**APPENDIX A – EQUIVALENCE DATA**

For purposes of this Order, "equivalence data" means "chemical data or biological test data intended to show that two substances or mixtures are equivalent." 40 CFR § 790.3. Also, when a chemical substance is "equivalent," it means "that a chemical substance is able to represent or substitute for another in a test or series of tests, and that the data from one substance can be used to make scientific and regulatory decisions concerning the other substance," as defined in 40 CFR § 790.3.

If testing under TSCA section 4(a) is required of an equivalent chemical substance, the EPA may grant an exemption from testing to the manufacturer or processor of one substance if the information required under TSCA section 4(a) is submitted or is being developed on the other, and the manufacturer or processor submits the following information to support equivalence with its exemption application:

1. The chemical identity of each chemical substance or mixture manufactured or processed by the applicant for which the exemption is sought. The exact type of identifying data required may be specified in this Order and may include all characteristics and properties of the applicant's substance or mixture, such as boiling point, melting point, chemical analysis (including identification and amount of impurities), additives, spectral data, and other physical or chemical information that may be relevant in determining whether the applicant's substance or mixture is equivalent to the specific test substance.

2. The basis for the applicant's belief that the substance or mixture for which the exemption is sought is equivalent to the test substance or mixture.

3. Any other data which exemption applicants are directed to submit in this Order which may have bearing on a determination of equivalence. This may include a description of the process by which each chemical substance or mixture for which an exemption is sought is manufactured or processed prior to use or distribution in commerce by the applicant.

**APPENDIX B – COST SHARING**

The EPA encourages Order recipients that are responsible for developing the same information on the same chemical(s) to avoid duplicative testing and share the cost of information development. If a test is conducted according to a final, approved protocol, it is sufficient that the test is conducted once. Two ways to avoid duplicative testing are discussed in this Order. They are forming or joining a consortium, discussed in **Unit VIII**, or requesting an exemption, discussed in **Unit IV.B.3**.

Consortia

Persons that form or join a consortium typically execute an agreement with the other members of the consortium concerning how costs will be shared and how the consortium will operate.

Exemptions

Persons that receive exemptions from testing have an obligation to reimburse the person(s) who perform the testing and submit the required information that is the basis for the exemption for a portion of the costs incurred in complying with the requirement to submit such information, and any other person required to contribute to a portion of such costs. Entities that have incurred costs in complying with the testing requirement may seek reimburse from exemption holders as soon as they receive the EPA's notification that the testing requirement has been satisfied. Apportionment of costs is often (and ideally) negotiated between the companies involved, without EPA participation. The EPA has promulgated regulations that explain how the EPA views fair and equitable reimbursement in the context of TSCA Section 4(a) test rules. In general, those regulations (40 CFR § 791.40 through § 791.52) make a presumption that a person's fair share of the test costs is in proportion to their share of the total production volume of the test chemical over a specified period of time that begins one calendar year before the effective date of the rule and continues up to the latest data available upon resolution of a dispute. While those regulations do not bind EPA action regarding reimbursement with respect to TSCA Section 4 orders, recipients may wish to consider them as they decide how to share the costs.

If an order recipient has been granted an exemption, and agreement cannot be reached on the amount and method of sharing the cost of developing the information, the person whose information is the basis for the exemption may request that the Administrator order the person(s) granted the exemption to provide fair and equitable reimbursement after considering all relevant factors, including the share of the market and the effect on the competitive position of the person required to provide reimbursement in relation to the person to be reimbursed. See TSCA Section 4(c)(3)(A). Upon receipt of such a request, the EPA will determine fair and equitable reimbursement and issue an order accordingly. The Agency may, at its discretion, make use of procedures and standards applicable to data reimbursement regarding TSCA Section 4 rules, contained in 40 CFR part 791.

**APPENDIX C – HOW TO ACCESS THE CDX APPLICATION AND RECORDKEEPING REQUIREMENTS**

***How to Access the CDX Application***

The initial response, draft and final study plans, final test reports with underlying data, existing studies, any testing related requests, and all related correspondence must be submitted electronically to the EPA as follows:

1. Submit to the EPA's CDX system. CDX is the point of entry on the Environmental Information Exchange Network (Exchange Network) for submissions to the Agency.

2. The URL for the CDX website is https://cdx.epa.gov which takes you to the CDX homepage.

3. On the homepage you may select "Log in" or, if you haven't already registered, select "Register with CDX."

4. Once you have logged on to CDX, follow the instructions for submitting TSCA Section 4 Order information. To access the instructions, select "Report electronically" on the EPA Assessing and Managing Chemicals under TSCA webpage.

5. The CDX Help Desk is available for data submission technical support between the hours of 8:00 am and 6:00 pm (EST) at 1-888-890-1995 or helpdesk@epacdx.net. The CDX Help Desk can also be reached at 970-494-5500 for international callers. Additionally, CDX Test Order guidance materials are available for users to follow.

The EPA may revise these submission instructions with advance notice.

***Recordkeeping***

You must retain copies of all information documenting your compliance with this Order for ten years. This includes your response and other documents and correspondence submitted to comply with this Order, such as test protocols, testing related requests, final test reports with their underlying data, and any penalties remitted.

**APPENDIX D – ORDER RECIPIENT SELECTION**

This Appendix describes the process by which the EPA identified recipients of this Order. This information is for your use and does not govern the obligations under this Order or the identities of the companies subject to this Order. A recipient of this Order that manufactures or processes the chemical as per the definitions provided in **Unit I.B** is subject to this Order, regardless of the basis on which the EPA identified the recipient.

The EPA queried for companies with known associations with 6:2 FTAc from the EPA Chemical Information System (CIS) within recent years. The EPA CIS is an internal platform for managing data and reporting submissions under TSCA. Some submission types that are housed in CIS include Inventory Update Reporting (IUR), Chemical Data Reporting (CDR), Pre-manufacture Notifications, and Notice of Activity forms. Based on such submissions, the EPA has included entities associated with this chemical substance.

**APPENDIX E – SPECIFIC REQUIREMENTS AND GUIDANCE FOR THIS ORDER**

This appendix provides requirements of study plans and test reports for specific testing requirements of this Order. Consistent with the EPA's tiered testing strategy and best practices for Integrated Approaches to Testing and Assessment, these requirements describe the design and quality to generate the different lines of information, including physical-chemical properties, that will be used in sequence to inform additional test requirements and data needs. It is required to perform testing according to the methods within the specified OECD test guidelines, unless explicitly modified below or with written approval by the EPA. Specific modifications and key study requirements for the study plans and test reports are listed under each test guideline, below.

For information on how the EPA determined the need for testing in this Order, refer to **Unit II.B**.

1. **Physical-Chemical Properties**

    *Tier 1.1*

    a. **Melting Point/Melting Range OECD 102 (1995) (**OECD, 1995b**) or OCSPP 830-7200/OPPT 796.1300/OPP 63-5 (1998) (**USEPA, 1998**)**

        i. **Study Plans**

            See **Unit VI.C** of the Order for overall requirements for study plans.

            1. Must include three measurements.

        ii. **Test Reports**

            In addition to the requirements provided by **Unit VI**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

            1. Harmonized Template OHT 2 (Melting point/Freezing Point)

            2. Harmonized Template URL: https://www.oecd.org/env/ehs/testing/OHT%202%20-%20ENDPOINT_STUDY_RECORD.Melting_v5.2%20-Dec%202018.doc

    b. **Boiling Point OECD 103 (1995) (**OECD, 1995c**) or OCSPP 830.7220/OPPT 796.1220/OPP 63-6 (1996) (**USEPA, 1996**)**

        i. **Study Plans**

            See **Unit VI.C** of the Order for overall requirements for study plans.

            1. Must include three measurements.

  **ii. Test Reports**

  In addition to the requirements provided by **Unit VI**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

    1. Harmonized Template OHT 3 (Boiling Point)

    2. Harmonized Template URL: https://www.oecd.org/ehs/templates/OHT-3-endpoint-study-record-BoilingPoint-v6.3-Sept-2020.doc

 **c. Vapor pressure OECD 104 (2006) (**OECD, 2006**)**

  **i. Study Plans**

  See **Unit VI.C** of the Order for overall requirements for study plans.

    1. Must include three measurements at each temperature.

  **ii. Test Reports**

  In addition to the requirements provided by **Unit VI**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

    1. Harmonized Template OHT 6 (Vapour Pressure)

    2. Harmonized Template URL: https://www.oecd.org/env/ehs/testing/OHT%206-%20ENDPOINT_STUDY_RECORD.Vapour_v4.2%20-Dec%202018.doc

 **d. Water Solubility OECD 105 (1995) (**OECD, 1995a**)**

  **i. Study Plans**

  See **Unit VI.C** of the Order for overall requirements for study plans.

    1. Must include measurements from three successive runs.

  **ii. Test Reports**

  In addition to the requirements provided by **Unit VI**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

    1. Harmonized Template OHT 8 (Water Solubility)

2. Harmonized Template URL: https://www.oecd.org/env/ehs/testing/OHT%208%20-%20ENDPOINT_STUDY_RECORD.WaterSolubility_v4.2%20-Dec%202018.doc

**e. Hydrolysis as a Function of pH OECD 111 (2004) (**OECD, 2004a**)**

   **i. Study Plans**

   See **Unit VI.C** of the Order for overall requirements for study plans.

   1. Follow the test performance criteria in OECD 111, including 'optional' testing at pH 1.2 for physiological conditions and reporting relevant intermediary hydrolysis products including and may not be limited to 3,3,4,4,5,5,6,6,7,7,8,8,8-tridecafluorooctan-1-ol (6:2 FTOH; CAS #647-42-7) and perfluorohexanoic acid (PFHxA; CAS #307-24-4).

   2. Must include triplicates where OECD testing guideline specifies duplicates (for measurements, analytical runs, sampling timepoints, etc.). For instance, must include triplicate analyses of each buffer solution (or extracts) at each sampling time. Must include triplicate samples contained in separate reaction vessels for each sampling time.

   3. Applicability and performance dependent on results of vapor pressure and water solubility, as noted in OECD 111.

   **ii. Test Reports**

   In addition to the requirements provided by **Unit VI**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

   1. Harmonized Template OHT 25 (Hydrolysis)

   2. Harmonized Template URL: https://www.oecd.org/env/ehs/testing/OHT%2025%20-%20ENDPOINT_STUDY_RECORD.Hydrolysis_v4.3%20-Dec%202018.doc

**f.  *n*--octanol/water Partition Coefficient HPLC Method, or *K*_ow OECD 117 (2022) (**OECD, 2022**)**

   **i. Study Plans**

   See **Unit VI.C** of the Order for overall requirements for study plans.

   1. Must include triplicates where OECD testing guideline specifies duplicates (for measurements, analytical runs, sampling timepoints, etc.). For instance,

must include triplicate measurements of log $K_{OW}$. Must include triplicates for the determination of retention time.

**ii. Test Reports**

In addition to the requirements provided by **Unit VI**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. Harmonized Template OHT 7 (Partition Coefficient)

2. Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%207%20-%20ENDPOINT_STUDY_RECORD.Partition_v8.1%20- Jul2023.docx

**2. Environmental Fate and Behavior**

*Tier 1.1*

**g. Estimation of the Adsorption Coefficient, or $K_{OC}$, on Soil and on Sewage Sludge using High Performance Liquid Chromatography (HPLC) OECD 121 (2001) (**OECD, 2001**)**

**i. Study Plans**

See **Unit VI.C** of the Order for overall requirements for study plans.

1. Must include triplicates where OECD testing guideline specifies duplicates (for measurements, analytical runs, sampling timepoints, etc.). For instance, must include triplicate runs for determination of log $K_{OC}$ values. Must include triplicate measurements of dead time and retention time.

**ii. Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. Follow OECD TG 121

2. Harmonized Template Identifier: OHT #34 (Adsorption/Desorption).

3. Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2034%20-%20ENDPOINT_STUDY_RECORD. AdsorptionDesorption_v8.2%20-Jul%202023.docx

Tier 2.1

**h. Bioaccumulation in Fish: Aqueous and Dietary Exposure OECD 305 (2012) (OECD, 2012)**

This test evaluates the potential for bioaccumulation of substances in aquatic species through direct aqueous (305 I & 305 II) or dietary (305 III) exposure.

**i. Study Plans**

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Must include the following: fish lipid content, as well as the lipid normalization factor ($L_n$), fish weight (whole body), fish total length, and growth rate ($k_g$). Test substance concentration in fish ($C_f$) and test substance concentration in water ($C_w$) at all sampling times. Moreover, as the bioconcentration factor (BCF) is to be based on the test substance, the major metabolites should be characterized with concentrations reported; major metabolites are those representing ≥ 10% of total residues in fish tissues, those representing ≥ 5% at two consecutive sampling points, those showing increasing levels throughout the uptake phase, and those of known toxicological concern. Curves for fish growth, uptake and depuration, and time to steady-state should include both raw data and fitted models. Bioconcentration factors for steady-state ($BCF_{SS}$) and kinetic ($BCF_K$), with uptake ($k_1$) and depuration rate constants ($k_2$). Further, the depuration rate constant ($k_{2g}$), kinetic BCF ($BCF_{Kg}$), and half-life ($t_{1/2g}$) should be presented as growth-corrected. Likewise, include lipid-corrected values for the steady-state BCF ($BCF_{SS-L}$) and kinetic BCF ($BCF_{KL}$), as well as a growth- and lipid-corrected kinetic BCF ($BCF_{KgL}$). Must be performed in both sexes.

   Must include flow-through test design and the following additional values for dietary exposures: measured time zero concentration ($C_{0,m}$), derived time zero concentration ($C_{0,d}$), and chemical concentration in the food ($C_{food}$). Calculate the growth-corrected half-life ($t_{1/2g}$), lipid correction factor ($L_c$), ingestion rate (I), effective feeding rate (adjusted for growth; $I_g$), and the substance assimilation efficiency ($\alpha$), When conducting dietary exposure, the above BCF are referred to as biomagnification factors (BMF). Provide the indicative lipid-corrected steady-state BMF ($BMF_{SS-L}$) and the kinetic dietary BMF ($BMF_K$), as well as its growth- ($BMF_{Kg}$) and lipid- and growth-corrected values ($BMF_{KgL}$).

2. Must include the following: test design and duration used with justification, lipid content testing, uptake and depuration phase sampling schedule with justification, water sampling schedule, tissue, food, and water analytical test methods, and gross necropsy including malformation identifications and absolute fish weights.

ii. **Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. Report all husbandry data, including the number of fish used, mortality, and abiotic data, range-finder and preliminary test results, and any observed abnormal behaviors.

3. Harmonized Template Identifier: OHT #32 (Bioaccumulation: aquatic/sediment).

4. Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2032%20-%20ENDPOINT_STUDY_RECORD. BioaccumulationAquaticSediment_v9.3%20-Jul%202023.docx

3. **Health Effects: Dermal Route**

*Tier 1.2- required testing dependent on results of Tier 1.1 Hydrolysis as a Function of pH test*

i. **Skin Absorption:** *In Vitro* **Method OECD 428 (2004) (**OECD, 2004b**)**

i. **Study Plans**

1. Refer to Series on Testing & Assessment No. 156 (IOMCED, 2022) for performing this testing.

See **Unit VI.C** of the Order for overall requirements for study plans.

ii. **Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan and test guideline requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. The study plan and test guideline requirements for handling chemical substance preparation and stability must be provided in the final test report.

3. Harmonized Template Identifier: OHT #59 (Dermal absorption). Harmonized Template URL: https://www.oecd.org/ehs/templates/OHT%2059%20-%20ENDPOINT_STUDY_RECORD.DermalAbsorption_v9.1-%20Jul2023.docx

## 4. Health Effects: Mechanistic for Genotoxicity

*Tier 1.2- required testing dependent on results of Tier 1.1 Hydrolysis as a Function of pH test*

### j. Bacterial Reverse Mutation Test OECD 471 (2020) (OECD, 2020)

This testing screens for genotoxic activity and specifically, point mutation-induing activity, which involves substitution, addition, or deletion of one or more DNA base pairs. While required as part of a suite of testing for genotoxicity, this testing alone whether positive or negative is not sufficient to provide direct information on the mutagenic and/or carcinogenic potency of the test substance.

#### i. Study Plans

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Must include considerations for test substance preparation and stability.

2. Deviations from the standard procedure needs to be scientifically justified and based on physical chemical properties results from tier 1.1 which may impact testing applicability and performance. See TG considerations for test substance solubility and propensity to precipitate.

#### ii. Test Reports

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan and test guideline requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. The study plan and test guideline requirements for handling chemical substance preparation and stability must be provided in the final test report.

3. Harmonized Template Identifier: OHT #70 (Genetic toxicity *in vitro*). Harmonized Template URL: https://www.oecd.org/ehs/templates/OHT%2070%20-%20ENDPOINT_STUDY_RECORD.GeneticToxicityVitro_v11.2%20-Jul2023.docx

One of the following:

**k.  *In Vitro* Mammalian Chromosomal Aberration Test OECD 473 (2016) (**OECD, 2016b**)**

This testing uses cultured mammalian cells *in vitro* to identify test substances that cause structural chromosomal aberrations of two types: chromosome or chromatid.

**i.  Study Plans**

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1.  Must include considerations for test substance preparation and stability.

2.  Must consider the influence of selected cell lines characteristics on the detection of aberrations, *e.g.*, p53 status, genetic stability.

3.  Deviations from the standard procedure needs to be scientifically justified and based on physical chemical properties results from *tier 1.1* which may impact testing applicability and performance. See TG considerations for test substance solubility and propensity to precipitate.

**ii.  Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1.  The study plan and test guideline requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2.  The study plan and test guideline requirements for handling chemical substance preparation and stability must be provided in the final test report.

3.  Harmonized Template Identifier: OHT #70 (Genetic toxicity *in vitro*). Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2070%20-%20ENDPOINT_STUDY_RECORD. GeneticToxicityVitro_v11.2%20-Jul2023.docx

**l.  *In Vitro* Mammalian Cell Micronucleus Test OECD 487 (2023) (**OECD, 2023**)**

This *in vitro* test evaluates the potential of a test substance to cause genotoxicity via detection of micronuclei in the cytoplasm of interphase cells, of either human or mammalian origin.

**i.  Study Plans**

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Must include considerations for test substance preparation and stability.

2. Deviations from the standard procedure needs to be scientifically justified and based on physical chemical properties results from Tier 1.1 which may impact testing applicability and performance. See TG considerations for test substance solubility and propensity to precipitate.

**ii.  Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan and test guideline requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. The study plan and test guideline requirements for handling chemical substance preparation and stability must be provided in the final test report.

3. Harmonized Template Identifier: OHT #70 (Genetic toxicity *in vitro*). Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2070%20-%20ENDPOINT_STUDY_RECORD. GeneticToxicityVitro_v11.2%20-Jul2023.docx

**m.  *In Vitro* Mammalian Cell Gene Mutation Tests Using the Thymidine Kinase Gene OECD 490 (2016) (**OECD, 2016c**)**

This test evaluates potential genotoxicity via detection gene mutations induced by the test substance.

**i.  Study Plans**

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Must include considerations for test substance preparation and stability.

2. Deviations from the standard procedure needs to be scientifically justified and based on physical chemical properties results from *Tier 1.1* which may impact testing applicability and performance. See TG considerations for test substance solubility and propensity to precipitate.

**ii.  Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test a are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan and test guideline requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. The study plan and test guideline requirements for handling chemical substance preparation and stability must be provided in the final test report.

3. Harmonized Template Identifier: OHT #70 (Genetic toxicity *in vitro*). Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2070%20-%20ENDPOINT_STUDY_RECORD. GeneticToxicityVitro_v11.2%20-Jul2023.docx

**5. Health Effects: Oral and Inhalation Routes**

*Tier 2.1- required testing*

**n. Toxicokinetics OECD 417 (2010) (OECD, 2010), oral route**

**i. Study Plans**

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Must be conducted in both sexes of rats and mice. Requested values and data should be represented by species and sex.

2. Must perform a pilot study to inform study plan parameters, including and may not be limited to the pre-determination of relevant metabolites, mass balance, analytical procedures, dose finding, exhalation of $CO_2$. The pilot may also inform whether radiolabeling of the test substance is required.

3. Must include the following: Must be performed in both sexes of rats and mice test organism information, including age, sex, and mass. Concentrations and identities of the test substance and metabolites in the test solution, tissues (including blood and plasma), and excreta. When reporting concentrations, include measured value (μg/kg) and as percent recovered of administered dose. Calculate the rate of absorption, material balance, bioavailability (F), AUC, $C_{MAX}$, $T_{MAX}$, clearance, and half-life ($t_{1/2}$).

4. In the case that no substance is detected in tissues at study termination (*e.g.*, because the substance might have been eliminated before study termination due to a short half-life), care should be taken in order to prevent misinterpretation of the data. In this type of situation, tissue distribution

should be investigated at the time of test substance (and/or metabolite) peak plasma/blood concentration ($T_{MAX}$) or peak rate of urinary excretion, as appropriate (see paragraph 38 of the Test Guideline). Justification and rationale for sample selection (*i.e.*, which organs/tissues are collected at sacrifice) should be provided, except that whole blood and plasma or red blood cells and plasma must be included.

5. Must include justification and descriptions for the following: experimental design, including the inclusion of expired air testing, number and frequency of oral doses and concentrations, gavage vehicle, and excreta sampling timeline (including proposed Day 1 collections). The feeding schedule with focus on the administration/restriction of feeding prior to dosing. Must also provide analytical techniques for testing of test substance and metabolites in the test solution, tissues, and excreta.

### ii. Test Reports

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. Report all husbandry data, including feeding schedules and mortality, pilot study data, including testing expired air and excreta to coordinate appropriate Day 1 sampling, and any observed abnormal behaviors.

3. Harmonized Template Identifier: OHT #58 (Basic Toxicokinetics).

4. Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2058%20-%20ENDPOINT_STUDY_RECORD. BasicToxicokinetics%20_v10.2%20-Jul%202023.docx

*Tier 2.2- required testing in a single rodent species dependent on TK oral study results; in no specific tiered order*

### o. Toxicokinetics OECD 417 (2010) (OECD, 2010), inhalation route

### i. Study Plans

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Must perform a pilot study to inform study plan parameters, including and may not be limited to the pre-determination of relevant metabolites, mass

balance, analytical procedures, dose finding, exhalation of $CO_2$. The pilot may also inform whether radiolabeling of the test substance is required.

2. Must be conducted in the rodent species in which 6:2 FTAc has the longer half-life (identified by the above outlined oral TK test). Requested values and data should be represented by sex.

3. Must include the following: test organism information, including age, sex, and mass. Concentrations and identities of the test substance and metabolites in the test solution, tissues (including lungs and nasal tissues), and excreta. When reporting concentrations, include measured value ($\mu$g/kg) and as percent recovered of administered dose. Calculate the rate of absorption, material balance, bioavailability (F), AUC, $C_{MAX}$, $T_{MAX}$, clearance, and half-life ($t_{1/2}$).

4. In the case that no substance is detected in tissues at study termination (*e.g.*, because the substance might have been eliminated before study termination due to a short half-life), care should be taken in order to prevent misinterpretation of the data. In this type of situation, tissue distribution should be investigated at the time of test substance (and/or metabolite) peak plasma/blood concentration ($T_{MAX}$) or peak rate of urinary excretion, as appropriate (see paragraph 38 of the Test Guideline). Justification and rationale for sample selection (*i.e.*, which organs/tissues are collected at sacrifice) should be provided, except that whole blood and plasma or red blood cells and plasma must be included.

5. Must include justification and descriptions for the following: experimental design, including the information for headgear, duration of inhalation exposure and concentrations, and excreta sampling timeline (including proposed Day 1 collections). The feeding schedule with focus on the administration/restriction of feeding prior to dosing. Must also provide analytical techniques for testing of test substance and metabolites in the test solution, tissues, and excreta.

**ii. Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. Report all husbandry data, including feeding schedules and mortality, pilot study data, including testing expired air and excreta to coordinate appropriate Day 1 sampling, and any observed abnormal behaviors.

3. Report any portal-of-entry effects.

4. Harmonized Template Identifier: OHT #58 (Basic Toxicokinetics).

5. Harmonized Template URL: https://www.oecd.org/ehs/templates/
OHT%2058%20-%20ENDPOINT_STUDY_RECORD.
BasicToxicokinetics%20_v10.2%20-Jul%202023.docx

**p. TK-derived half-life < 7 days: Combined Repeated Dose Toxicity Study with the Reproduction/Developmental Toxicity Screening Test OECD 422 (2016) (**OECD, 2016a**), oral route**

**i. Study Plans**

Please see **Unit VI.C** of the Order for overall requirements for study plans.

1. Repeated dosing of males should be conducted for at least twelve weeks (84 d), including ten weeks prior to mating, during mating, and, approximately, two weeks post mating up to and including the day prior to the scheduled sacrifice.

2. Extend the duration of the study throughout pup weaning (PND 21). Dosing of the parental animals should be continued through lactation until PND 21. Pup body weight should be recorded on PND 0, 4, 7, 14, and 21. Litter size can be standardized to 4 pups/sex/litter on PND 4 (optional).

3. The concentration of the test article must be confirmed in the media used for dosing (*e.g.*, food, drinking water, gavage formulation) at least weekly. The frequency of testing may be adjusted based on the results of the OECD 111 hydrolysis study and the media used for dosing. The concentration of the test article must be measured in serum on a weekly basis in all animals. The frequency and timing of sampling may be adjusted based on the results of the OECD 417 toxicokinetics study. If limits on blood collection from pups makes this infeasible, they can be omitted from sampling. At sacrifice, the concentration of the test article must be measured in all animals in the following tissues: serum, liver, and brain. Follow-up may include additional analyses of the test article and/or metabolites in preserved tissues.

4. The functional observations that are listed in the OECD 422 guideline are mandatory for this study. Timing of the functional observations should be guided by the results of the OECD 417 toxicokinetics study and the results of

any other *in vivo* testing (*e.g.*, range-finding) and explicitly justified in the study plan.

5. Must include the following: $F_0$ masses at first dose for all individuals, and once weekly to termination. During pregnancy, females should be weighed on days 0, 7, 14, and 20 and within 24 hours of parturition, and at least day 0, 4, 7, 14, and 21 post-partum; number of implantations, date of pregnancy, duration of gestation (calculated from Day 0 of pregnancy), litter size, offspring sex, and individual offspring mass should all be reported. Offspring mass should be taken Day 0, 4, 7, 14, and 21. Measure anogenital distance (AGD) (and body weight on day of AGD measurement), and male offspring nipples/areolae counts. Food consumption measured weekly. Once during the study, 5 adult males and 5 adult females from each group should be sampled for blood and plasma for haematological and biochemistry responses, including haematocrit, haemoglobin concentrations, erythrocyte count, reticulocytes, total and differential leucocyte count, platelet count, and a measure of blood clotting time/potential. Plasma or serum analyses should include sodium, potassium, glucose, total cholesterol, urea, creatinine, total protein and albumin, at least two enzymes indicative of hepatocellular effects (*e.g.*, alanin, aminotransferase, aspartate), and bile acids. Further, blood samples should also be taken from 1) at least two pups per litter on Day 4 after birth, 2) all dams and at least two pups per litter the end of weaning (PND 21), and all adult males at termination; serum levels in Day 21 pups and adult males, as well as dams and Day 4 pups, should be assessed for thyroid hormones (*e.g.*, TSH, T4). Histological results of male testes. Full necropsies (at time of death and termination) for all individuals, including organ weights (specifically the liver, kidneys, adrenals, thymus, spleen, brain, and heart), observation and mass of gonads and reproductive systems, and thyroid glands (from all adult males, all adult females, and one male and one female pup at the end of weaning (Day 21) from each litter). Descriptions of histopathological examinations on preserved tissues, including gross lesions, brain, spinal cord, eye, stomach, small and large intestines, liver, kidneys, adrenals, spleen, heart, thymus, trachea and lungs, gonads, accessory sex organs, vagina, urinary bladder, lymph nodes, peripheral nerve, skeletal muscle and bone, with bone marrow.

6. Must include justification and descriptions for the following: experimental design, including the vehicle choice, exposure concentrations, test substance formulation/diet preparation and its stability/homogeneity. The description of the diet fed (*e.g.*, nutrition, quality) should also be reported. Detailed description and justification for randomization procedure to select pups for culling, if necessary. Justification (and supporting data) must be included for selected statistical analyses for endpoints of interest (*e.g.*, pup AGD, pup

body weight) with attention given to the distribution of the data. Must also provide analytical techniques for testing of test substance.

**ii. Test Reports**

In addition to the requirements provided by **Unit VI.C**, test reports submitted to the EPA for this test are due by the deadline specified in the table in **Unit V.B** and must include the following, as applicable:

1. The study plan requirements must be reflected in the final test report including all non-significant and negative results and/or deviations from the protocol.

2. Report clinical signs. Report all husbandry data, including mortalities and euthanizations, and feeding schedules and abnormal behaviors. All collected data should be included and reported, along with appropriate statistical analyses and calculated endpoints (*i.e.*, NOAEL, LOAEL, etc.) that support study summaries.

3. Report Functional Observational Battery (FOB) results.

4. Harmonized Template Identifier: OHT #67 (Repeated dose toxicity: oral).

5. Harmonized Template URL: https://www.oecd.org/ehs/templates/ OHT%2067%20-%20ENDPOINT_STUDY_RECORD. RepeatedDoseToxicityOral_v9.2%20-Jul2023.docx

**If the TK-derived half-life is greater than or equal to 7 days**, the OECD 422 study may require modifications under Agency advisement. Anticipated modifications may include extending the pre-mating exposure period. Extending the pre-mating exposure period may better compensate for the longer half-life of the test substance and achieve steady state of the test substance before mating occurs, in order to observe potential exposure-related reproductive and developmental effects.

**APPENDIX F – SUMMARY OF AVAILABLE DATA**

All reasonably available data considered for the determination of testing needs in this Order for 6:2 FTAc were robust study summaries retrieved from the ECHA Registered Substances Database. While these study summaries indicated effects following a 28-day oral exposure to 6:2 FTAc on rat liver and kidney size, as well as numerous histopathological, hematological, and behavioral endpoints, the underlying study quality is evaluated on an outcome-by-outcome basis (*e.g.*, Health Outcome) in accordance with the draft TSCA Systematic Review Protocol 4(h)(1)(A), 26(k). As the underlying study reports and data were unavailable for review, the robust summaries do not fulfill the data needs of this Order. ECHA Robust Study Summaries for this substance are available in docket number EPA-HQ-OPPT-2024-0364 at https://www.regulations.gov.

**APPENDIX G – ADDITIONAL UNDERLYING INFORMATION**

**PREDICTIVE MODELING**

Note that PFAS are known to have unique properties which may impact model applicability. 6:2 FTAc was analyzed using the EPA's expert system OncoLogic™ 9 (USEPA, 2021b). The overall level of cancer concern was Low to Moderate, with the concern being highest for the inhalation route of exposure. The Oncologic Justification Report reads:

> An acrylate is a potential alkylating agent which may bind, via Michael addition, to key macromolecules to initiate/exert carcinogenic action. The alkylating activity of acrylates can be substantially inhibited by substitution at the double bond, particularly by bulky or hydrophilic groups. The nature and molecular size/shape of the molecule to which the acrylate is attached may also play a role in affecting the overall activity of the compound.

> Compounds containing more than one reactive functional group (RFG) are potential crosslinking agents which may initiate/exert carcinogenic action by causing DNA-DNA or DNA-protein crosslinks. The crosslinking activity is dependent on the distance between the RFGs with an intergroup distance of 2-9 atoms being the favorable range. Molecular flexibility may also play an important role. Compounds containing RFGs that are at the terminal ends of freely flexible aliphatic chains are more favorable crosslinking agents than those containing RFGs situated within a rigid cycloaliphatic ring.

> The acrylate is stable and has a baseline level of concern of LOW-MODERATE.

> The fluoro substituents on R1 are not expected to significantly affect the level of concern. Therefore, the level of concern remains LOW-MODERATE. [Note: OncoLogic™ looks at functional groups and the remainder of the molecule is considered an "R" group. In this case, OncoLogic™ assigned 6:2 FTAc a general formula of R1-O-C(=O)-C=C where R1 is                    .]

> In general, inhalation and injection provide the best chance of delivering the largest possible amount of direct-acting reactive chemicals to target tissue because of a lesser absorption barrier and better chance of avoiding detoxification by protective nucleophiles such as glutathione. Exposure to the compound by either of these routes is expected to raise the level of concern to MODERATE.

> Exposure by the oral and dermal routes is not expected to significantly affect the level of concern, therefore the level of concern remains LOW-MODERATE.

> The final level of concern when the anticipated route of exposure is inhalation or injection is MODERATE.

The final level of concern when the anticipated route of exposure is oral or dermal is LOW-MODERATE.

6:2 FTAc was analyzed using the "Protein binding alerts for skin sensitisation according to United Nations (UN) Globally Harmonized System of Classification and Labelling of Chemicals (GHS)" and the "Respiratory sensitisation" profilers in the OECD QSAR Toolbox version 4.6. The skin sensitization profiler predicted that 6:2 FTAc was a GHS Category 1B sensitizer based on its membership in the "alpha, beta-carbonyl compounds with polarized double bond_low reactivity" chemical class. The respiratory sensitization profiler predicted that 6:2 FTAc was a sensitizer based on its membership in the "Michael Addition/Polarized alkenes/Acrylates" chemical class; however, the EPA generally only considers bifunctional electrophiles in this class to have concerns for respiratory sensitization, so this prediction was considered not human-relevant.